UNITED STATES, Appellee

v.

JOSEPH M. WALLACE, JR., Private–2, U. S. Army, Appellant

2 USCMA 595, 10 CMR 93

No. 988

Decided June 3, 1953

LT COL George E. Mickel, U. S. Army, and 1ST LT Richard M. Hartsock, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted by a general court-martial for violation of Article 90 of the Uniform Code of Military Justice, 50 USC § 684, involving willful disobedience of a lawful order of a superior officer, and cowardly conduct, in violation of Article 99 of the Code, supra, 50 USC § 693. He was sentenced to a dishonorable discharge, total forfeitures and twenty years' confinement. Reviewing authorities approved, except a board of review in the office of The Judge Advocate General of the Army, reduced the confinement to fifteen years. We granted the accused's petition for review to determine the questions of whether there was a multiplicity of charges, and whether the instructions of the law officer were sufficient. Since granting this review we ██ have held that specifications similar to those used in this case allege, and facts similar to those proven in this instance establish, separate offenses. See United States v. Soukup (No. 533), 7 CMR 17, decided January 23, 1953. Based on the authority and reasoning of that case we hold against the accused on the first question.

The facts produced by the Government are scanty. The accused reported to the commanding officer of Company A, 9th Infantry, at its forward command post. The officer, a first lieutenant, informed the accused he was being assigned to the 2d Platoon which was occupying a position on a designated hill. The accused replied he could not go to the assigned area. The officer explained the consequences of disobeying his order, then called his executive officer and in his presence, repeated the order to accused. Substantially the same reply was received. When it became apparent the accused was not going to comply with the order, he was

placed under guard and returned to the rear command post.

Accused testified in his own behalf, recited a history of his military service and stated his version of the events. While he related a rambling version, his story was substantially this: After serving three months in Korea his feet were frozen and he was sent to a collecting station for treatment. This was in March 1951. He then spent some time with headquarters company, was then transferred to A Company, and then to K Company. Upon arriving in K Company he was reduced in grade from a private first class to a private, although he did not know why. In June 1951, he was wounded, and was sent to the hospital. After this he was transferred back to A Company, and while there he received a concussion from a mortar. After spending a few more days in the hospital, he was again returned to his company. The accused then went absent without leave, and was confined in the stockade for this offense. Upon being released from the stockade he was told that he was going home on rotation. However, before he was to leave, he developed a swelling in his groin, and he was then transferred to Taegu for observation. When he returned to his company on January 4, 1952, several other men of his company had been ordered back to the United States. He was then told he was going to be court-martialed so he went to see his commanding officer. The commanding officer told him he was being sent back to the second platoon, and the accused explained his nervous condition, and informed the officer that he could not go back to that platoon. He had no intention of disobeying the officer, but he was afraid he would shoot one of his buddies, for he feared he might blackout when firing. He was not afraid of the enemy, but was afraid of himself.

I

The first specification against the accused recites:

"In that Private Joseph M. Wallace, Jr. . . . having received a lawful command from First Lieutenant Charles M. Blake Jr., his superior officer, to join the forward elements of his company, did, in the vicinity of Kumwha, Korea, on or about 4 January 1952, willfully disobey the same."

In his instruction to the court-martial the law officer listed as the elements of this offense:

"(a) That the accused received a certain command from a superior officer, as alleged;

"(b) That such officer was the superior officer of the accused; and

"(c) That the accused willfully disobeyed the command."

We previously considered the sufficiency of an identical instruction in the case of United States v. Charles F. Simmons (No. 505), 5 CMR 119, decided September 26, 1952. In that case we came to the conclusion that the law officer must inform the court that in order to return a finding of guilty it must find the accused knew the person issuing the order was his superior officer. We there stated:

"While we have not specifically held that there is a duty on the part of the law officer to instruct on what might be clearly identified as an affirmative defense, we have suggested that a court-martial is insufficiently informed as to the law of the case without legal explanation of the defenses properly raised. See United States v. Ginn (No. 263) 4 CMR 45, decided July 10, 1952. In this case knowledge as an element of the offense, or lack of knowledge as an affirmative defense, are so closely interwoven into the pattern of the crime that the court-martial could not fairly determine petitioner's guilt unless told that in order to return a finding of guilty, it must find the accused knew he was being addressed by a superior officer. Assuming knowledge not to be an essential element it is a factual issue, which, if found in favor of an accused, does not excuse, justify or avoid the crime, but on the contrary establishes there was no crime and it is impracticable to disassociate it from other elements of the offense.

598

In that situation the law officer has the responsibility of giving an instruction on that issue and the duty should be performed with or without a request. It follows that regardless of whether we view knowledge as an element of the offense or defense, the court-martial was not properly instructed."

Under the ruling of that case we held the law officer erred but we call attention to the limitation we specifically imposed on the principles announced. We quote from page 5:

"Assuming, arguendo, that the Government's contention could be sustained, and that lack of knowledge was an affirmative defense which must be established by the accused, the question is still unanswered. There remains a determination of whether an instruction must be given on that issue without a request having been submitted by an accused. Under the facts in this case, there was an issue of knowledge because the evidence for the Government showed accused to be intoxicated; his own testimony indicated that he was so under the influence of liquor he 'blacked out' and had no recollection of the events. From a factual standpoint, the duty of the law officer to instruct on an issue is not founded on whether he believes the story told by witnesses for the Government or by the accused, it is based on the necessity of giving the members of the court-martial a clear picture of what is in issue so that they can accept either version of the evidence and test it by the instructions given. Testimony of an accused is sufficient to make an issue and in this case there is evidence from which the court could have reasonably found that the petitioner was not cognizant of the fact that the order was issued by an officer."

We reiterate again that in this particular crime, it is unimportant whether we designate knowledge an element of the offense or fact to be proven as an affirmative defense because, if in issue, the court must be told to consider it in arriving at a finding. However, because it falls so close to the border we will not reverse for failure on the part of the law officer to include it as an element of the offense if it is not reasonably raised as a factual issue. If knowledge is conceded, if the evidence compels a finding that the accused knew the order was given by an officer, or if the record is barren of any evidence from which it could reasonably be inferred the accused might not know that a superior officer was issuing the order, then the error, if any, is nonprejudicial. If, on the other hand, the evidence permits a finding of lack of knowledge, then the accused has just cause to complain. Applying the foregoing test, the accused was in no way prejudiced by the law officer's omission in this case, for the only evidence is to the effect that he was aware Lieutenant Blake was his superior officer. The conversation took place in the company area at 11 o'clock in the morning. The officer was wearing his insignia of rank. In answer to the question, "Did the accused make any acknowledgment of your rank or position as Commanding Officer?" Lieutenant Blake stated, "Not that I remember. *I informed him who I was when I talked to him.* (Emphasis supplied.) Later in the trial, the accused gave the following testimony:

". . . . He [the company clerk] *told me to report to the CO. I reported to Lieutenant Blake, and he introduced himself as CO,* and after a conversation I asked him if I could get my job back on the carrying party, and he said that he had to send me to the 2nd Platoon, and that his hands were tied, and there was nothing else he could do. . . ." [Emphasis supplied.]

Other testimony found in the record does not touch on whether the accused knew Lieutenant Blake was his superior officer so the only evidence, direct or circumstantial, before the court-martial, was that the accused knew he was receiving an order from his superior officer. With the quantity and quality of the evidence on this point not being lessened, weakened, or damaged by in-

consistencies or contradictions, only one finding could have been returned by the court. In that situation we can say with assurance that no prejudice resulted to the accused from the law officer's failure to direct the court to consider knowledge or lack of knowledge in arriving at a finding of guilty or not guilty.

## II

Appellant next questions the sufficiency of the instructions of the law officer with regard to the cowardice charge. The specification recites:

"In that Private Joseph M. Wallace, Jr. . . . , in the vicinity of Kumwha, Korea, on or about 4 January 1952, in the presence of the enemy, was guilty of cowardly conduct, in that he wrongfully failed to join the forward elements of his company as it was his duty to do."

The elements of this specification as listed by the law officer included:

"(a) That the accused committed an act of cowardice, as alleged; and "(b) That this act occurred while the accused was before or in the presence of the enemy."

Appellant argues that the court-martial should have been informed that it must find beyond a reasonable doubt that the accused's conduct was motivated by fear. In the recent case of United States v. Soukup, supra, we consider this precise question under identical instructions. We held there that it was of paramount importance that the court be informed accurately of the presence of fear among the ingredients of the offense for which he was on trial. Furthermore, particular danger of prejudice existed when the evidence was such that the failure to join might be motivated by factors other than fear. That the conduct of the accused in this case may well not have been prompted by fear is reasonably possible. While his testimony reads rather unimpressively, he testified to having been in combat for some time and to having been wounded twice; that he had not been afraid to carry out his duties while under combat conditions; that his refusal to go forward was not prompted by fear of the enemy, but by fear that he might black out and shoot one of his buddies. The testimony of Lieutenant Blake was not inconsistent with this theory although some of the circumstances were. However, unless the testimony of the accused is conflicting, uncertain, inherently improbable or unworthy of belief, it must be considered for sufficiency of raising an issue. Because the law officer failed to require a finding on a material matter in issue, this finding must be reversed.

## III

The other assignments of error have been considered and they are overruled without comment. Either they are rendered immaterial by our holdings on the other contentions advanced or they have been considered in previous cases and the law settled and publicized in other opinions.

The findings on the charge of willfully disobeying the order of a superior officer is affirmed, while that on the cowardly conduct is reversed. The sentence is set aside and the cause is remanded to The Judge Advocate General of the Army for disposition consistent with the views expressed herein.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring in the result):

I agree that our holding in United States v. Soukup (No. 533), 7 CMR 17, decided January 23, 1953, requires reversal of the conviction of cowardly conduct here for failure on the part of the law officer to instruct the court with respect to the element of fear. I also agree that no error was committed by the law officer in his instructions on willful disobedience. However, I must set down my divergent views concerning some of the matters dealt with in the majority opinion.

## II

Although I am not at all out of agreement with their result, I cannot accept my brothers' resolution of the question

raised by the failure of the law officer to instruct the court that knowledge on the part of the accused that the individual who issued the order is "his superior officer" is an essential element of the offense of willful disobedience. The majority avoids a determination of the question of whether this sort of knowledge is an element of the crime with which we are presently concerned—and, as I understand its members, their reasoning runs something like this. If knowledge is *not* an element, a failure to instruct thereon does not, of course, constitute error, in the absence of evidence fairly placing the matter in issue. On the other hand, if knowledge *is* an element, it must be the subject of instruction, and a failure in this particular constitutes error. However, in the absence of evidence similarly placing the matter in issue, this error will not be deemed prejudicial. Here—the argument continues—no issue of knowledge was raised. Therefore, under either view no prejudicial instructional error was committed, and there is no necessity for reaching a conclusion concerning the elemental character of knowledge.

While I certainly do not believe that all problems require an "either-or" approach, I cannot avoid thinking that the present one—indeed, any question involving the determination of a crime's basic ingredients—should be considered in terms, not of gray, but of black or white. A certain subject of proof either is or is not an element of the offense to which it relates—and for a very compelling reason. If it *is* an essential ingredient it *must* be included within the law officer's instructions on the elements of the offense charged—regardless of whether raised by the evidence —and, as a general proposition, it is ipso facto reversible error to admit it. We held this in United States v. Clay (No. 49), 1 CMR 74, decided November 27, 1951, where the instructional failure was complete, and we have reached the same conclusion in other cases where the omission of the law officer was only partial—that is, where one or some, but less than all, elements were unmentioned by him. United States v. Ollie C. Williams (No. 251), 2 CMR 137, decided March 14, 1952; United States v. Drew (No. 422), 4 CMR 63, decided July 23, 1952; United States v. Banks (No. 382), 4 CMR 71, decided July 24, 1952; United States v. Cromartie (No. 374), 4 CMR 143, decided August 6, 1952.

It does not follow, however, that every instructional failure is necessarily within Clay and a fortiori the protection of military due process. We held, for example, in United States v. Lucas (No. 7), 1 CMR 19, decided November 8, 1951, that a total instructional failure did not constitute reversible error in the face of a plea of guilty. See also in this connection United States v. Kubel (No. 229), 5 CMR 73, decided August 29, 1952. It must be recognized, of course, that special and compelling considerations are required to remove an instance of instructional omission from the operation of the Clay principle. My brothers appear to find one of these in the fact that knowledge was not in issue here. While I am not prepared at this moment to say that this may not under some conceivable circumstances furnish a basis for such a conclusion, I am certainly unwilling to agree that in *all* —or even most—situations it should be deemed to do so. *Quare* as to an instruction on premeditated murder which omits all reference to premeditation— regardless of the posture of the evidence. In the present case I am not required to take a position on this question—for the record reflects not only that the evidence *failed* to raise a want of knowledge on the part of the accused, but contains as well an express and *positive* judicial admission by him that he was aware of the officer status of Lieutenant Blake, the source of the disobeyed command. I am sure that this removes the case from Clay—with the result that, although knowledge be regarded as an element of willful disobedience, the law officer's failure does not reach the level of reversible error. However, granting that the demands of the case at bar do not compel definitive disposition of the knowledge problem, to my mind we *should* dispose of it in the interest of affording necessary and proper guidance to the tribunals below us in the hierarchy of military law.

It is perfectly true that on two occasions by way of dicta this Court has indicated that knowledge might well be deemed in a proper case an element of the crime with which we are here concerned. United States v. Snyder (No. 409), 4 CMR 15, decided June 5, 1952; United States v. Charles F. Simmons (No. 505), 5 CMR 119, decided September 26, 1952. However, the question was not before us then for necessary and definitive determination. Although my brothers do not appear to agree with me, it is—as I see it—distinctly before us now, and I have been anxious to record my convinced views on the subject.

I turn first to Article 90 of the Code, 50 U.S.C. § 684, which delineates the crime with which we are concerned. It provides simply that the offense is committed by one who "willfully disobeys a lawful command of his superior officer". There is here no mention that knowledge on the part of the accused of the "superior officer" character of the source of the command must be specifically and affirmatively shown in every case. Examining the Manual for Courts-Martial, United States, 1951, paragraph 169b for further guidance, I find that the elements of proof set out are: "(a) That the accused received a certain command from a certain officer, as alleged; (b) that such officer was the superior officer of the accused; and (c) that the accused willfully disobeyed the command." So, in this phrasing—as in that of the Code itself—there appears no indication that the prosecution must establish beyond a reasonable doubt in all cases that the accused person knew that he was disobeying the order of a superior commissioned officer. However, from that portion of paragraph 169b entitled "Discussion," as distinguished from the part characterized as "Proof" and quoted above, it appears that "the accused must know that it [the command] is from his superior officer." Yet this by no means requires the conclusion that such knowledge is an *element* of the offense. There is no real inconsistency between this Manual expression and the view that a want of knowledge of this sort is an affirmative defense—for it is certainly this, at

least. Indeed, one who is ignorant of the fact that the military person issuing the command is his superior officer cannot possess—in disobeying the command—the requisite "intentional defiance of authority" at which the Code's proscription of the offense is directed. Manual, supra, paragraph 169b.

Highly instructive in the premises is a provision found in the Manual's paragraph 170a, which treats in general of insubordinate conduct directed against *noncommissioned* personnel, in violation of Article 91 of the Code, 50 USC § 685. Here we are told that the fact "That the accused did not know that the person assaulted was his superior is a *defense* to a violation of this article." (Emphasis supplied.) Through an incorporation by reference, this language, relating to assault, is made applicable to paragraph 170c, which deals with the crime of willful disobedience of the order of a noncommissioned, warrant or petty officer. The result of this incorporation is to make clear beyond peradventure that in the case of a violation of Article 91(2), a want of knowledge of the superior noncommissioned status of the source of the order is a matter of defense. In this there is nothing whatever inconsistent with the provisions of the Uniform Code—with the result that we are bound by the Manual's unequivocal direction in the matter. United States v. Lucas, supra. With this provision in mind, would it not be inconsistent to hold—unless somehow compelled to do so—that knowledge of the character involved here is not a defensive matter, where the offense alleged is willful disobedience of a commissioned officer, but instead is an element of the crime? I find it exceedingly difficult to believe that the draftsmen of the Manual intended to create this inconsistency, and to distinguish in this particular between Article 91(2), involving noncommissioned superiors, and Article 90(2), involving commissioned superiors. Certainly I can conceive of no possible reason for the distinction.

On the basis of the details set out in preceding paragraphs, and as a matter of Manual interpretation, I conclude

that knowledge is *not* an element of the offense of willful disobedience in violation of Article 90(2), but rather a subject for affirmative defense. This view, I believe, is supported by the practicalities of the situation. It is conceivable, of course, that on rare occasions, an officer may issue a command while attired in civilian clothes. It is also true that, for obvious reasons, officers in advanced combat areas frequently remove the indicia of their grade. Yet in the overwhelming majority of instances in which a command is issued, its source will be found to be palpably and inescapably labeled. He will be in uniform and overtly wearing his eagles, his bars or his chevrons. Under these circumstances, it is reasonable to suppose that the draftsmen of the Manual simply saw no point in including as an element of willful disobedience a matter almost never in real issue. Charging on knowledge in most instances of this offense would constitute no more than a vain and nugatory act. And this Court has repeatedly demonstrated that, where want of knowledge is fairly raised by the evidence, it will require an instruction as to its legal effect. Here, however, no such want was raised. Indeed, it is manifest that the accused was fully aware that he was speaking with a superior officer on the occasion in suit. Therefore, in viewing want of knowledge as defensive matter, it was not raised, and the instructions of the law officer on willful disobedience were not incomplete.

It has been suggested that the position urged in these pages is in conflict with that taken by a united Court in United States v. Snyder, supra. There we held that knowledge, actual or constructive, of a regulation issued by the Post Commander, Camp Lejeune, North Carolina, was an element of the offense of failure to obey "any lawful general order or regulation", in violation of the Uniform Code, supra, Article 92 (1). I find no conflict—even inconsistency—whatever. It must be manifest that Snyder and the present case deal with two wholly different problems. Although they share the question of whether "knowledge" constitutes an element of *an* offense, they have to do, in the first place, with totally different crimes, and, in the second, with quite different sorts of knowledge.

In determining in the present case that knowledge of the "superior officer" character of the source of the command is not an element of willful disobedience, in violation of Article 90, supra, the problem was approached both from the standpoint of statutory—that is, Code and Manual—interpretation, as well as from that of function—that is, in terms of what were characterized as the "practicalities of the situation". Utilizing identical approaches toward the problem in the Snyder case, an entirely different result necessarily obtains. Although both there and here the appropriate Manual subparagraph, "Proof" omits reference to "knowledge", quite different language is otherwise involved, and the data from which the intention of the draftsmen is to be ascertained are not at all the same in both cases. Cf. the Manual, supra, paragraphs 154a (4), 169b, 170a, and 170c, and 171a. As to the offense involved in Snyder, paragraphs 154a(4) and 171a expressly provide that knowledge, either actual or constructive, must be shown to convict an accused person of failure to obey an order or regulation of the nature there in suit.

So much for the spectacles of statutory interpretation. What of those of function? Here, too, we find a sharp distinction. Earlier reference has been made to the fact that in the overwhelming majority of instances in which a command is issued by an officer to a military subordinate, the former will be found to bear upon his person openly the indicia of his status—the insignia of his grade worn in such a fashion that he who runs may read. Turning to the Snyder offense, involving not the verbal direction of a superior, but the general order or regulation of a command, we find a readily distinguishable situation. There, no such aid to information is in any way present, and much more often will the question of knowledge genuinely be in issue. It is, therefore, easy to understand why the draftsmen of the Manual viewed the two offenses in different lights, and why they sought to include knowledge as an

**603**

element in the Snyder offense, yet determined to relegate the same factor to defense status in the present one. Thus I conclude that there is no conflict between the Court's view in Snyder and my own here.

### III

In view of the Court's reversive action with respect to the conviction under the charge of cowardly conduct, the issue of multiplicity has become of no practical importance to the accused here. However, I cannot agree with the determination reached by the majority on this subject. It is said that our decision in the Soukup case, supra, requires a finding that multiplicity is not present in this one. The point is made, indeed, that the facts in that case are "similar to those proven in this instance. . . ." I cannot know that this is true, nor—by reason of insufficient facts of record—do I believe that the majority can do so with any sort of assurance. The accused in Soukup was charged with cowardly conduct in failing to join the forward elements of his company, and additionally with the willful disobedience of a lawful command of a superior officer to join the forward elements of his company. In that factual complex, we concluded that:

"... Here the accused, who had been stationed with his company at the front, was discovered some three or four miles to the rear. When ordered to return to his unit he failed to do so. The result is that two separate duties were thereby breached—the one to *remain* with his company on the line; the other to obey the direct and specific order to *return* thereto. To sustain the charge of cowardly conduct, it would certainly not have been necessary to prove the breach of the duty to obey the direction to return to the front—for the reason that the accused had previously been assigned to the line by a separate and distinct order. The breach of the latter, if motivated by fear, would alone constitute cowardly conduct. Likewise, it could hardly have been necessary to prove, in connection with the charge of willful disobedience of a lawful order, that the accused had been guilty of cowardly conduct in failing to remain with the forward elements of his company—a duty imposed by an utterly different directive. We conclude, therefore, that the offenses charged in this case were entirely separate."

In the case before us now the facts may be wholly different, and we cannot be sure they are not. The accused here had at an earlier time served as an ammunition bearer with Company A, 9th Infantry. During a reserve period he had been sent to Taegu for medical treatment. On his return to his unit command post, he was directed by his company commander to report to the 2nd Platoon. It is evident that this constituted a change of assignment. He refused verbally to accept this order and, in fact, did not obey it. Subsequently, he, like Soukup, was charged with cowardly conduct in failing to join the forward elements of his company, and additionally with the willful disobedience of the command of a superior officer to join these critical elements. It seems clear to me that the cowardly conduct charge here is based on the wrongful failure of the accused to join the 2nd Platoon, which was certainly in the presence of the enemy. Now, if this is true, I must—under Soukup—inquire whether the accused was under a pre-existing legal duty to serve with this element at the time he was ordered to do so by Lieutenant Blake. If he was, we have here a Soukup situation, and there is no multiplicity. On the other hand, if he was not, then we must conclude that there was multiplicity, and that the situation presented here is precisely what that in Soukup was *not*. Within the answer to this inquiry, as I see it, lies the key to the entire problem. And as to it, the record affords me literally no specific information. How then can my brothers discern that the instant case is within the principle of Soukup? Indeed I am in a much better position to say—if I wished to do so—that it is outside that doctrine, for I am aided to this conclusion by our frequent adjuration that doubts must be resolved in favor of an accused—in this case, in the direction of a finding of multiplicity.

However, since the present case is merely being utilized by me as a vehicle for the elaboration of a point of view concerning multiplicity, I shall simply assume that no duty on the part of the accused to join the 2nd Platoon existed prior to Lieutenant Blake's direction to do so. On this assumption, our analysis in Soukup requires me to conclude that the charges here are clearly multiplicious.

That does not, however, solve the problem raised by the assertion of multiplicity. As we have observed heretofore—in Soukup, in fact:

". . . we should point out that no error would necessarily result from charging and convicting the accused of offenses arising out of the same transaction—even though the offenses be not separate. Manual, supra, paragraph 74b(4). Difficulties arising from an allegation of multiple offenses growing out of what appears to be a single transaction are fully met in connection with principles having to do with the imposition of sentence. Only if the offenses are separate, may an accused be sentenced for each. Manual, supra, paragraph 76a(8)."

In this connection—and under the assumption mentioned earlier—there is a further and different approach which may serve to demonstrate even more clearly the non-separate character of the charges in the present case, and the relationship of this phenomenon to the sentencing power of the court. We have previously pointed out the impossibility of divorcing the *charges* from the *facts* in a case where the question raised relates to lesser included offenses. United States v. Joe L. Davis. (No. 646), 10 CMR 3, decided May 14, 1953. Considering the facts here, we observe that it would have been impossible to prove the offense of cowardly conduct without first establishing the willful disobedience alleged. To put it in a slightly different fashion, the cowardly conduct in this case consisted of *the* willful disobedience motivated by fear—so that if the prosecution, with respect to the cowardly conduct alleged, had failed to prove the element of fear only, it *would* necessarily have established the willful disobedience with which we are concerned. The latter offense was, therefore—and under the special facts of this case—lesser included, I believe, within the cowardly conduct charged. This points up sharply the multiplicious nature of the charges, and brings into play paragraph 76a(8) of the Manual, supra, which provides that: "An accused may not be punished for both a principal offense and for an offense included therein because it would not be necessary in proving the included offense to prove any element not required to prove the principal offense."

It is apparent, therefore, that error in this connection arises when, and only when, the accused has received a sentence based on each of two or more offenses which are not separate. Under the assumption stated earlier, the offenses charged against this accused are not separate ones. In the ordinary case, therefore, it would be necessary to scrutinize with care the post-findings action of the court-martial, together with any instructions of the law officer as to sentence, for the purpose of determining the legality of the punishment imposed. In the present case, of course, and for reasons suggested earlier, such a course would serve no purpose of practicality—and I can have no quarrel with the disposition directed by the majority.