UNITED STATES, Appellee

v.

IVERY V. ROBINSON, Private E–2, U. S. Army, Appellant

4 USCMA 488, 16 CMR 62

No. 4632

Decided July 2, 1954

Lt Col James C. Hamilton, U. S. Army, and Capt Fred A. Chalupsky, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, and 1st Lt William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

Review of this finding and sentence was granted by us upon the petition of accused as provided under Article 67(b)(3), Uniform Code of Military Justice, 50 USC § 654. He was tried by general court-martial at Fort Eustis, Virginia, in November 1953, for three offenses: disrespect toward a superior officer, willful disobedience of the order of a superior officer, and willful disobedience of the order of a superior noncommissioned officer, in violation of Articles 89, 90 and 91, respectively, of the Uniform Code of Military Justice, 50 USC §§ 683, 684, 685. The court-martial found him guilty on all three specifications and charges and sentenced him to dishonorable discharge, forfeiture of all pay and allowances,

**489**

and five years' confinement at hard labor. The convening authority approved the findings and sentence without modification, and they were affirmed by an Army board of review.

Our grant of review was inaptly phrased, but the issue was intended to reach the question of whether the law officer erred in failing to instruct sua sponte on the effect an injection of morphine would have on (1) accused's specific intent to commit the offenses alleged, and (2) his knowledge that he was contemptuous to and disrespectful of his superior officers. Since the issue here involves the failure to give an instruction, the facts must be set forth in some detail.

On August 21, 1953, the FS-221, a 180-foot Army Transportation Corps vessel, was docked at Cleveland, Ohio, on a scheduled stop. The accused was a regular crew member aboard the vessel. Ten days previous to the events which now concern us, he had been restricted, along with another crew member, for an infraction of discipline. He was punished under Article 15 of the Code, 50 USC § 571, and his pass privileges were revoked. Although four days remained before his restriction was to be lifted, accused, at his request, was given a three-hour pass to proceed into Cleveland to get his hair cut. He left the vessel, went into town, accomplished the purpose of his visit and returned to the boat within the three-hour period. Upon returning aboard the vessel, accused pursued the course of conduct giving rise to the charges preferred.

The sequence of events commenced when accused asked permission of a Warrant Officer Junior Grade to speak to the Master of the vessel. This was authorized and he proceeded to the wardroom occupied by Chief Warrant Officer Whitmore, who was Master of the vessel. He knocked on a screen door and requested permission to discuss a personal matter with the officer. The request was granted and accused asked Whitmore to lift his restriction and let him have a weekend pass. Whitmore refused the request, telling accused that his restriction was in effect until August 24, 1953. Accused thereupon flew into a rage. He demanded in a loud and belligerent voice that he be given the same treatment as the other enlisted man whose pass privileges had been restored. He accentuated his demands by pounding on the table. He was directed to stand at attention by Whitmore and after continuing his tirade for a short time, he finally complied with the order with his fists clenched at his sides. However, he failed to remain at attention and resumed his angry outburst, repeating the demand that he be permitted to go on pass. The Master left the wardroom and was followed out to the deck and back to the wardroom by the accused who continuously insisted on the return of his privileges. After accused refused to leave the wardroom when ordered to do so, Whitmore sent for Captain Cheney. He was the officer in charge of the section to which accused was assigned. Accused met Captain Cheney just as he came on deck and repeated to the Captain his demands for restoration of his pass privileges. The Captain informed him they would not be restored until the expiration of the restriction period, whereupon accused directed some foul and profane remarks to Captain Cheney. During the discussions, the Captain ordered accused to go to his quarters three times, but the accused refused to obey, and at one time stated, "I am going to refuse to obey that order and any order that you or any other officer on this ship gives." Finally, Cheney sent for the Master and in his presence gave the accused a direct order to go to his quarters to which accused replied, "I am disobeying that direct order and any other order you give." Military police in Cleveland were called and accused was taken ashore and locked up for the night. He was returned to the ship the following morning and resumed his duties for the return voyage to Fort Eustis.

None of these facts were disputed by the accused at the time of trial. Instead he testified that he requested a pass on August 19, 1953, for the purpose of going to town and getting his hair cut but that he was not permitted to leave until two days later. He said

he left the vessel, got a cab and proceeded to a barbershop in town where he had his hair cut; that his side began to bother him; that as he was leaving the barbershop a girl stepped out of a taxicab; he stopped her and asked for assistance in obtaining a doctor; that she led him a short distance to the office of a Dr. Knox who gave him two shots of morphine to relieve the pain, and a prescription to be filled at a pharmacy; and that he paid $33.00 for the professional services. He further testified that he and the girl then went to her house about a block away; that she discussed with him subjects such as the Army and boats; that he was there about thirty minutes; and that he recalled nothing more until he was awakened the next morning in jail. The probability of this testimony will be scrutinized when we refer subsequently to the testimony given by accused on cross-examination and to his spontaneous reactions at the time of the offense.

The first issue is whether the testimony of accused required the law officer to give an instruction, not requested, on the effect of a narcotic on specific intent. We hold that it did not for the reason that the uncorroborated story of accused is bizarre, fantastic, and unworthy of belief. When it is viewed in its entirety, it falls far short of influencing the most gullible person. The accused claims he was in pain from a constipation condition. He had been treated on a prior occasion by being given a mild laxative. He asked for a pass on August 19, 1953, so as to go to town for a haircut. He failed to mention the pain to anyone aboard ship on that date or on the two intervening days. He did not press for his pass but rather it was given him two days later without any further action on his part. He testified he was in pain when he picked up his pass; yet instead of going to a doctor, his avowed primary purpose, his first stop was at the barber shop. He claims his pain became more intense; but instead of seeking military assistance, he conveniently met a girl stepping out of a taxicab, who happened to know a Dr. Knox, who conveniently administered morphine. The latter had an office nearby. For some reason, which he was unable to explain, the accused could not give the general location of the doctor's office; he could not remember his benefactor's name; he was unable to describe her general appearance; and, he was uninformed as to the location of her home to which he hied away after leaving the doctor's office, although he remembered it was close by. It is, of course, coincidental that accused's mind retained information which was helpful to his cause, but that which might lead to damaging testimony was forgotten.

His description of what happened at the doctor's office is contrary to experience, common sense, and medical standards. There are, of course, dope peddlers who are not doctors; but at the time of trial there was no contention by accused that he had been duped by one acting outside the law. He was supposedly in a doctor's office for fifteen minutes; he apparently described his symptoms, but he did not inform the doctor of the severity of his discomfort; he received two shots of morphine and a prescription, and paid the doctor $33.00 without any protest when he could have received treatment at no cost to himself. That portion of the story must be considered in the light of further evidence furnished by him. A medical officer who was called by the defense testified that morphine would not ordinarily be used to give relief for constipation, and that it was a medical axiom never to use morphine when you can use drugs of lesser potency; and the latter were readily available in any drug store. The doctor further testified that there were only two situations in which a double dose of morphine would probably be given in an office, and that the physical complaint described by accused was not one of them. Particularly would a physician be disinclined to administer that drug and turn a patient loose on the street.

Further facts which shatter the accused's story may be related. He remembers in detail all of the favorable events happening during his three-hour pass until he lost his memory. How-

ever, his whole defense depended on proving a bona fide attempt to alleviate his suffering, and yet he never made any attempt to get the prescription filled; he was unable to produce the prescription he allegedly obtained; he obtained no receipt for his payment of $33.00; he was unable to furnish any leads which could be used to corroborate or disprove his assertion and, yet, every place seems conveniently located within an area small enough to fit his time schedule. Furthermore, as previously stated, he could not give any information concerning the doctor or his office; and when his counsel suggested in his final argument that he had been hurried in his defense, the law officer recommended a fifteen-day continuance to permit him an opportunity to corroborate his story. The time was granted and defense counsel contacted the police department of the City of Cleveland. The police officials cooperated, but reported back that there was no doctor by the name of Knox practicing anywhere in the State of Ohio; and the records of the department failed to show any individual by that name suspected of selling narcotics.

Other evidence in the record fortifies our conclusion as to the inherent improbability of the story. Accused's acts, appearance, demeanor, and conduct belie his claim of being doped. His behavior was that of an angry man, not one filled with narcotics. He had received Article 15 punishment on August 10, 1953, along with a fellow crew member, resulting in the restriction of both men. Before the restrictive period had expired, the other man's punishment was remitted; but that of the accused was not. His was continued in force because he neglected his watch four days before these offenses occurred and his commanding officer, therefore, saw fit to allow the original restriction to remain untouched. Accused was mentally capable of understanding who he was dealing with and their alleged persecution of him. He conceived he was being discriminated against and expressly so stated to Mr. Whitmore and Captain Cheney. He complained that the punishment im-

posed on him was unfair and unjust and he likened his treatment to that given the Rosenbergs. He lost his temper when his demand for a pass was refused and his conduct is consistent with that of one bitterly resentful of what he believes to be discriminatory. The witnesses who observed the accused were called upon to describe his physical appearance and reaction, and the totality of their evidence shows that the symptoms associated with an overdose of morphine were conspicuously absent.

One additional point needs discussion. Even were we to assume arguendo that the accused was administered an injection of narcotics, there remains the requirement that the evidence show reasonably that his mental faculties were impaired to the extent he could not form the specific intent necessary to defy the subordinate-superior relationship. The rule stated by us in United States v. St. Pierre, 3 USCMA 33, 11 CMR 33, has direct application here. In that instance we said:

"Mere intoxication, regardless of degree, does not negative criminal responsibility in offenses involving relationship of subordinate to superior. As in offenses requiring a specific intent, to constitute a defense, intoxication must be of such a degree as to either destroy or seriously impair the ability of the accused to understand the existence of the above relationship. United States v. Backley (No. 1588), 2 USCMA 496, 9 CMR 126, decided May 12, 1953; United States v. Craig, 2 USCMA 650, 10 CMR 148, decided June 24, 1953. In this sense then, intoxication is only potentially capable of raising knowledge of the relationship as a factual issue."

Rather than showing the accused could not form the required intent, and did not recognize his superior officers and appreciate his willful defiance of authority, this record shows the absolute contrary. The words spoken, and the acts performed before Chief Warrant Officer Whitmore and Captain Cheney prove he fully recognized their relationship to him. He was aware

that it was Whitmore, the Master of the ship, who permanently controlled his pass and that he had authority to lift the restriction. When he concluded to see Whitmore, he followed the customs of the service. He first obtained permission from a junior officer, then he made his presence known by knocking on a screen door and asking to speak with the Master. Prior to the refusal his appearance and actions were normal and to those who saw and talked with him he was possessed of his usual physical and mental faculties. He came to attention at Whitmore's command. He recognized that the Captain might influence the granting of the pass. When discussing his difficulty with the officer, and after receiving orders to repair to his quarters, he responded by making two statements: "I am disobeying that direct order and any other order you give." "I am going to refuse to obey that order and any order that you or any other officer on this ship gives." We are satisfied from the undisputed evidence in the record that the acuity of accused's mental senses was not so impaired by morphine or any other narcotic that the law officer was required, on his own initiative, to interject mental diminution as an issue in the case. Whether or not he could remember at the time of trial is beside the point. His mental capacity to form a specific intent must be measured by his condition at the time the offense was committed. At that time his behavior shows he well understood the nature and gravity of his refusal to obey and that he consciously and willfully flaunted the authority of the officer and noncommissioned officer.

Based on our previous reasoning, we summarily dispose of the last issue, i.e., whether the law officer erred in failing to instruct that knowledge by the accused he was addressing a superior officer and noncommissioned officer was a fact which must be determined by the court-martial. We have held that knowledge, or lack of knowledge, may be an issue in the offenses of disrespect under Article 89, supra, United States v. Miller, 2 USCMA 194, 7 CMR 70, and of disobedience under Article 90, supra, United States v. Simmons, 1 US CMA 691, 5 CMR 119, and United States v. Wallace, 2 USCMA 595, 10 CMR 93. Therefore, assuming for the moment that accused related a true version of his mental condition, the court-martial was faced with a question of fact on that issue. He contended he had no recollection of the events, while his statements, acts, and conduct permit a contrary finding. The law officer framed the issue properly by specifically instructing the members of the court-martial that knowledge was an essential element of each offense charged and that they must find the presence of all elements beyond a reasonable doubt. That instruction made it necessary for the court-martial to determine where the truth lay, and it resolved the issue against the accused. He was entitled to no more.

The decision of the board of review is therefore affirmed.

Chief Judge QUINN and Judge BROSMAN concur.