UNITED STATES, Appellee

v.

JAMES J. BEENE, Private First Class, U. S. Army, Appellant

4 USCMA 177, 15 CMR 177

No. 2961

Decided April 16, 1954

Lt Col Edgar R. Minnich, U. S. Army, Capt William C. Irby, Jr., U. S. Army, and 1st Lt Alexander J. Jemal, Jr., U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, and 1st Lt Ezra B. Jones, Jr., U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

There has been no contest before this Court concerning the sufficiency of the evidence in the instant case. The record reflects that, while driving under the influence of liquor and at an exces-

sive speed, the accused struck and killed a German National, and thereafter fled from the scene of the accident. The first specification under which he was found guilty alleged that he did "operate a vehicle . . . while drunk, and did thereby cause said vehicle to strike and injure Walter Dudde," in violation of the Uniform Code of Military Justice, Article 111, 50 USC § 705. A second specification alleged that the accused did "by culpable negligence, unlawfully kill Walter Dudde by striking him on the body with an automobile," in violation of the Code, supra, Article 119, 50 USC § 713. A third specification—of no concern here—alleged the failure of the accused to stop at the scene of the accident, in violation of Article 134 of the Code, 50 USC § 728.

Having been found guilty as charged, the accused was sentenced to receive a dishonorable discharge, to total forfeitures, and to confinement at hard labor for three years. The convening authority reduced the confinement to two years, but otherwise approved both findings and sentence. A board of review in the office of The Judge Advocate General, United States Army, has affirmed. We granted review to inquire whether, in alleging both drunken driving resulting in personal injury and involuntary manslaughter, premised on the same transaction, "there was an unreasonable multiplication of charges and, if so, did it prejudice the accused in regard to the approved sentence."

## II

Federal decisions have settled that only one punishment may be assessed against acts which make out no more than one offense—this no matter how ingeniously that offense may be subdivided by the pleader. Ex parte Nielsen, 131 US 176, 33 L ed 118, 9 S Ct 672; Ex parte Snow, 120 US 274, 30 L ed 658, 7 S Ct 482. For the determination of what constitutes a separate offense, the draftsmen of the Manual made clear their intention to utilize the test enunciated by the Supreme Court in Blockburger v. United States, 284 US 299, 76 L ed 306, 52 S Ct 180. See Manual for Courts-Martial, United States, 1951, paragraphs 74b(4), 76a

(8); Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 78. This test announces that crimes are severally punishable if each requires proof of facts not demanded by the other. That the apparent simplicity of this rule is deceptive is demonstrated by a survey of the Federal cases. E.g., compare Robinson v. United States, 143 F2d 276 (CA 10th Cir) with Crespo v. United States, 151 F2d 44 (CA 1st Cir).

Government counsel before us have espoused as the Blockburger "rule" an interpretation thereof which has been said to constitute an *in vacuo* approach to the problem of multiplicity. United States v. Davis, 2 USCMA 505, 10 CMR 3; United States v. Larney, 2 USCMA 563, 10 CMR 61, concurring opinion. Under this interpretation, if offenses alleged may—*theoretically and conceivably*—be established by evidence not the same, cumulative sentences are sustainable. However, a unanimous opinion of this Court has rejected that view. United States v. Davis, supra. In that case we were discussing the question of whether another variety of homicide was necessarily included within that charged—a proper determination of which, we stated, "depends almost exclusively on *the facts stated and proved in support of the offense alleged.*" At the time we pointed out that an uncritical application of the separate offense test, which the Government contended was prescribed by the Manual's paragraph 76a(8), would lead to the result that an accused might be punished twice for a single homicide under specifications alleging felony murder and at the same time unpremeditated murder—a consequence thoroughly unacceptable to us.

We are sure that the principle announced in that case is not to be restricted to homicide offenses, and that Blockburger, or other Supreme Court cases, do not compel adoption of the Government's position. In previous opinions we have consistently sought to avoid a doctrinaire approach to the present problem. In United States v. Yarborough, 1 USCMA 678, 5 CMR 106, we applied the "separate element" test verbalized in the Manual, supra,

178

paragraph 76a(8). In United States v. Soukup, 2 USCMA 141, 7 CMR 17, we adverted to the same criterion, but stated explicitly that it was not one of universal application, and proceeded to analyze the situation before us in terms of "duty." Thereafter—in United States v. Davis, supra—we demonstrated what we had intimated earlier, that is, that the "elements" test could not serve as a universal solvent. In United States v. Redenius, 4 USCMA 161, 15 CMR 161, we relied in part on the "facts" approach of United States v. Blockburger and in part on that of "duty" enunciated in Soukup. See also United States v. Larney, supra; United States v. Wallace, 2 USCMA 595, 10 CMR 93.

### III

Through viewing the perplexing problem of multiplicity from a somewhat different vantage point, let us seek to identify "the reason behind the rule." Let us find, if we can, the core of the idea expressed in the phrase: one crime, one punishment. To this end let us scrutinize the subject through the spectacles of legal *norms* or *standards*.

The "duties" adverted to by us in Soukup, Redenius, and elsewhere are but the correlatives of juristic norms requiring adherence. These norms or standards—whether of legislative or judicial origin—are designed to facilitate societal living; and their binding power stems in large part from the premise that, apart from a regulated society, man is helpless to survive. The compulsion of group survival—a compulsion underlying such norms and the obligation to obey them—is reinforced through criminal law by the threat of penal action for failure to comply with their terms. It follows logically that punishment will be ascribed in accordance with the number and value of the norms transgressed. Thus if one was drunk and disorderly yesterday, steals today, and absents himself without leave tomorrow, it is apparent that three norms are embraced—and penal sanctions in the same number, and in varying degrees of severity, may be invoked against the culprit. So a private soldier, wearing sergeant's chevrons, may commit a battery upon another. Although the separate character of the offenses involved here may be less obvious than in the earlier example, it is equally clear that we are confronted by conflicts with two norms—and penal action in double measure may be taken against the offender for (1) assault and (2) impersonating a noncommissioned officer.

In United States v. Gavieres, 220 US 338, 55 L ed 489, 31 S Ct 421, we are afforded a vivid example of a single act or transaction which operated to violate more than one norm erected by Congress, and was properly deemed to result in the commission of two offenses, separately punishable. There the accused had uttered certain words under circumstances which led to his conviction for rude and indecent behavior in a public place. Subsequently he was tried for insulting a public official then in the execution of his office—and both charges were based on the same set of wrongful acts. In rejecting the defendant's plea in bar, the Supreme Court held that the crimes were separately punishable, since one required proof that the offensive words were uttered in a public place, while the other demanded that they be directed toward a public officer.

Two distinct norms were palpably involved. One related to the societal aversion to breaches of the peace induced by boisterous conduct in a public place; the other to the necessary protection of Government officials from molestation and abuse while prosecuting public business. In analogous fashion a married man who had cohabited with his sister would seem amenable to punishment for both incest and adultery—since the former offense is concerned with the proscription of sexual relations between persons consanguineous within a prescribed degree; the latter with the preservation of the institution of marriage. Apparently a similar analysis was early recognized in Roman Law. There, "Only one indictment was permitted if the offenses were based on the same ethical foundation; if different ethical foundations were involved several indictments would lie." Kirch-

**179**

heimer, The Act, The Offense and Double Jeopardy, 58 Yale LJ 513, 522.

It is suggested that the views proposed here are in no wise immiscible with those expressed by the Supreme Court in the Blockburger case. Blockburger indicates that each count of an indictment must require proof of a distinct and additional fact in order that it may constitute a basis for separate punishment. Our point simply is that this *fact,* of which proof is demanded, must be significant in that it involves the infringement by the accused of a distinct norm established by society through its lawmaking agencies. In short, this separate *fact* must constitute the open sesame to a separate *norm.* To require less would be to permit the multiplication of punishments through the artful, but meaningless, rephrasings of the prosecutor. Cf Ex parte Snow, supra.

## IV

But if the infringement of separate norms is to be the focus of our attention, how may we determine when a separate norm is involved? Since we are functioning in a field of law stemming principally from legislation, we are confronted in the main by a problem of statutory construction. In the solution of this problem several Supreme Court opinions will be of assistance. In Ebeling v. Morgan, 237 US 625, 59 L ed 1151, 35 S Ct 710, that Court was considering what offenses under Federal postal law had been committed by an accused who, in a single transaction, had opened several bags of mail. The Court concluded that Congress had manifested a clear intent "to protect each and every mail bag from felonious injury and mutilation," and that a "complete statutory offense was committed every time a mail bag was cut in the manner described, with the intent charged." The Court distinguished certain prior cases involving continuous offenses which the prosecutor had sought to fragmentize. See e.g., Ex parte Snow, supra; Crepps v. Durden, Cowp 640.

In Morgan v. Devine, 237 US 632, 59 L ed 1153, 35 S Ct 712, the Court considered whether, under Federal postal law, an accused might lawfully be punished under each count of a two count indictment—the one alleging breaking and entering a post office, the other a larceny of stamps and postal funds therefrom. It was observed that Congress had proscribed the unlawful entry of a post office and a larceny therefrom in completely separate divisions of the applicable statute, and that a "purpose was manifest in these sections to create two offenses." Accordingly, although a continuous transaction might have been involved—and one animated by but a single criminal intent—the Court concluded that consecutive sentences might lawfully be assessed under the two counts of the indictment.

In Albrecht v. United States, 273 US 1, 71 L ed 505, 47 S Ct 250, the Court determined that an accused was separately punishable for illegal possession of liquor and for illegal sale of the same liquor. The sale of the liquor and its possession were deemed wholly distinct offenses, and the Court emphasized that: "There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and punishing also the completed transaction."

In the Blockburger case itself the accused was found guilty of selling narcotics from a source other than the original stamped package, in violation of Section 1 of the Narcotics Act, 38 Stat 785, and at the same time of selling the identical drugs without having obtained a written order from the purchaser, in violation of Section 2 of that Act. The Court, observing again that the violations had been dealt with in separate sections of the Narcotics Act, commented that "upon the face of the statute, two distinct offenses are created." We must hold this repeated statement by the Supreme Court to intimate that—on the surface of things, at least—a legislature must be thought to be dealing with different norms when it denounces and penalizes misconduct in different divisions of the same legislation. See Morgan v. Devine, supra.

Pinkerton v. United States, 328 US 640, 90 L ed 1489, 66 S Ct 1180, re-

affirms the notion that an individual may be punished at once for a crime and for the conspiracy to commit that crime —although the overt act alleged in charging the conspiracy is the consummated offense. Cf. Manual, supra, paragraph 160. The conviction of the substantive crime does not bring into play any doctrine of merger as to the conspiracy, and vice versa. Here we find the most frequently encountered application of the principle expressed in Albrecht, supra—that is, that Congress may permissibly punish both the preparation for a crime and the crime itself. The only issue here is: What was the intent of Congress? Within the framework of our analysis, that issue in turn must reduce itself to an inquiry into whether Congress was or was not seeking to erect separate norms proscribing individually both the major offense and some act which led up to it. Generally speaking, of course—but perhaps not always—the question of whether the violation of one or more norms is involved in a case like the present one may be answered through a measurement of the charge sheet with the yardstick of gravamen.

V

Against a background of these observations, let us consider the question by which we are confronted ▆▆▆▆■ in the cause before us now. The accused was convicted of two crimes, and presumably sentenced thereon. The first of these was drunken driving resulting in personal injury, and the second was involuntary manslaughter. Initially we note that these two offenses are treated in quite different sections of the Uniform Code—Articles 111 and 119 respectively—a circumstance which suggests an intention that different norms be established. The gravamen of the latter offense is beyond doubt the killing of one human being by another, the death having been brought about in a certain sort of way. Injury and death, of course, are not *per se* punishable. Manual, supra, paragraphs 197*b* and *e*. It is the causation which imparts criminal significance to their occurrence. State v. Rosa, 72 NJL 462, 62 Atl 695.

What is the gravamen of the former crime? Article 111 of the Uniform Code is entitled, "Drunken or reckless driving," and *in toto* reads as follows: "Any person subject to this code who operates any vehicle while drunk, or in a reckless or wanton manner, shall be punished as a court-martial may direct." It will be noted that nothing whatever is said of personal injury, nor of the necessity for a finding of such harm to sustain a conviction under the Article in question. Indeed, it is quite clear that one may be guilty of a violation thereof without allegation, proof, or finding of injury.

Thus, the arm of the statute with which we are concerned must be deemed regulatory in nature, and held to possess a gravamen wholly different from that embraced within the offense of involuntary manslaughter. Of course, a principal reason for the attempt to remove drunken drivers from the highways is found in the state's wish to prevent the death of others. However, the prohibition also looks to an avoidance of injury to the property of others —as well as harm to their persons—and the maintenance of free communication and movement over public roads untrammeled by the presence of drunken drivers and the natural fears attendant thereon.

In connection with the specific facts of record in the case before us, the evidence of intoxication undoubtedly constituted one circumstance on which the court based its determination of culpable negligence. However, this evidence was supplemented by testimony showing excessive speed—another fact tending to establish negligence. Moreover, the accused did not become suddenly drunk an instant before the impact and sober an instant thereafter. Instead, the evidence would suggest that he drove while drunk for some time and over an appreciable distance, and thereby endangered persons other than the one he ultimately killed. Indeed, he was distinctly amenable to conviction for drunken driving prior to the time he struck his victim. Must he be deemed any the less amenable by reason of the subsequent and unlawful homicide committed by him? Clearly not.

We are sure indeed that separate penal action would have been proper had the accused been charged with drunken driving unadorned, and not with drunken driving resulting in personal injury. This is true for the reason that the two offenses are separately punishable under *any* test of which we are aware— that is, they are characterized by two gravamina, two ethical norms, two duties, two sets of elements and even two sets of facts. But he *was* charged with the more serious aspect of the crime. What of this?

We have concluded that the allegation of drunken driving was not included within the specification of involuntary manslaughter in the case before us. Injury resulting from drunken driving is no element of the offense of drunken driving, but rather it constitutes an aggravating circumstance. Yet we have held that this circumstance must be alleged, proved, and found in order to furnish a basis for additional punishment. United States v. Grossman, 2 USCMA 406, 9 CMR 36. Does the inclusion of the aggravating matter in the instant specification of drunken driving require the subsumption of that offense within the charge of involuntary manslaughter? As a matter of logic, if A is not totally included within C, then neither will A plus B be totally included therein. Similarly, if drunken driving is not embraced within involuntary manslaughter in a case like the one at bar, then drunken driving plus resultant injury may not be said to be included. The two specifications remain wholly separate and distinct—this despite the addition of a non-elemental allegation of injury to the drunken driving charge. Since the specifications *allege* separate offenses, there is no choice but to apply the rule of the Manual, supra, that "The maximum authorized punishment may be imposed for each of two or more separate offenses arising out of the same act or transaction." Paragraph 76a(8).

A glance at the Table of Maximum Punishments reveals that—under our conclusion—the presence of an allegation of personal injury within the drunken driving specification authorizes, on proper proof, the imposition of six months' confinement, in addition to that permitted for the same offense without injury. Manual, supra, paragraph 127c, section A, page 223. Yet as we construe the Table, this punishment is not being imposed for a violation of the societal norm forbidding the negligent or intentional infliction of injury on others, but rather for a violation of the legal standard proscribing drunken driving. The contention is made that we are permitting the accused to be punished doubly for the same injury to Walter Dudde—and that this is unjust. Admittedly—although at the risk of adding further refinement to an area already overburdened with complexity—we could have concluded that the only additional punishment authorized under the drunken driving specification is that provided for the offense unaccompanied by personal injury. However, since the two *specifications* before us are separate, we consider it preferable to apply without qualification the Manual's direction as to the punitive action authorized for separate offenses. Under our view the import, if any, to be accorded the circumstance that—although two ethical norms were transgressed—these violations occurred by reason of a single act or transaction, is not one affecting the legally established maximum punishment, but rather is an item for the sole consideration of the court-martial, which imposes the sentence as matter of fact.

## VI

The court-martial having been correctly informed of the maximum authorized punishment, we conclude that the decision of the board of review must be affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result for the reasons set forth at length in United States v. McVey, 4 USCMA 167, 15 CMR 167.