UNITED STATES, Appellee,

v.

Jesse T. LINGENFELTER, Sergeant,
U.S. Army, Appellant.

No. 63,372.
CM 8801228.

U.S. Court of Military Appeals.

Argued April 4, 1990.

Decided Aug. 13, 1990.

For Appellant: *Captain James Kevin Lovejoy* (argued); *Colonel Robert B. Kirby, Lieutenant Colonel Russell S. Estey, Captain Timothy P. Riley* (on brief).

For Appellee: *Major Maria C. Fernandez* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Lieutenant Colonel Richard A. Gallivan, USAR, Major Martin D. Carpenter, Captain Karen Taylor, USAR* (on brief).

*Opinion of the Court*

COX, Judge:

Appellant was tried by a military judge sitting as a general court-martial in Garlstedt, Federal Republic of Germany. He was charged with drunken or reckless driving, and with involuntary manslaughter, violations of Articles 111 and 119, Uniform Code of Military Justice, 10 USC §§ 911 and 919, respectively. The military judge convicted appellant of the single offense of drunken driving and sentenced him to be dishonorably discharged. In a short-form opinion, the Court of Military Review affirmed the findings and a bad-conduct discharge. We granted review of this issue:

WHETHER THE EVIDENCE WAS SUFFICIENT AS A MATTER OF LAW TO FIND APPELLANT GUILTY OF DRUNK DRIVING CAUSING THE DEATH OF MR. JENS STRUBBE WHERE APPELLANT'S CONDUCT WAS NOT THE PROXIMATE CAUSE OF THE VICTIM'S DEATH.

The facts of this unfortunate incident are these: On January 23, 1988, shortly after 9 p.m., in full darkness, appellant and Mr. Jens Strubbe were involved in an automobile collision near Bremerhaven, Federal Republic of Germany. Each was the sole occupant of his vehicle, and no one else witnessed the collision. Mr. Strubbe was driving a Honda Civic, appellant a Ford Escort. When the police arrived at the scene, they discovered Mr. Strubbe's vehicle split in two, the focus of impact being approximately the middle of the passenger compartment on the driver's side. An accident reconstruction expert, Mr. Erich Bohling, later testified that

the Ford Escort, by its speed, first cut up the Honda in two halves and two parts flew through the air. That is the front part of the Honda flew about 25 meters and the rear part flew about 15 to 20 meters.

The rear portion of the Strubbe vehicle came to rest at the base of a tree off the road. According to an officer at the scene, the impact point of the car on the tree appeared to be at a height of "about 1.5 or 1.8 meters up." Mr. Strubbe was found lying on the highway; he was pronounced dead at the scene.

The left front portion of appellant's vehicle bore the brunt of the impact. Mr. Bohling noted that, after the impact, appellant's vehicle "traveled another distance of about 60 to 65 meters and in addition had also touched a tree." Appellant sustained multiple contusions, sprains, and possible cracked ribs. He was hospitalized for several weeks and required extensive additional convalescence.

One of the first police officers to arrive at the scene asked appellant what happened. According to the officer's testimony:

He [appellant] said that he noticed a car parked on the right side.... He said when he reached that point where this car was or was parked, it resulted in a collision or there was impact but how it really occurred I couldn't—he couldn't say.

Asked again about appellant's account of the location of Mr. Strubbe's vehicle, the officer responded, "If I understood him correctly, the car was parked at the side of the driving lane but I cannot describe exactly the location."

This same officer noticed that appellant "appeared to be slightly under the influence of alcohol and one could sense the smell of alcohol." The officer "asked him [appellant] what he had been drinking and his answer was two bottles of beer in Hagen." A blood alcohol test taken on appellant more than 3 hours after the collision revealed 1.61 milligrams of ethyl alcohol per milliliter of blood. A doctor testified that appellant's blood alcohol level 3 hours earlier would have been "roughly in the ball park of 1.9 ... anywhere from 1.8 to 2.0." The same expert testified that

[t]he standard American Medical Text Book, Internal Medical Test [sic] Book, generally speaking, uses a number between 80 milligrams per deciliter [0.8 mg/ml] and 100 milligrams per deciliter [1.0 mg/ml] of .8 to 1.0 as the cutoff

point, as from intoxication as opposed to a person "non intoxicated."

Another officer, inspecting the road at the point of collision, observed "no indication whatsoever that the accused—or have no traces which I could base on the assumption that Sergeant Lingenfelter tried to apply the brakes or steer around the [deceased's] vehicle." The headlights of the deceased's vehicle were still on when the police arrived.

A member of appellant's unit, Specialist Four Victor M. Compilo, also happened on the scene. He assisted in attending to appellant, and he accompanied appellant to the hospital. According to Compilo, appellant

kept asking me how's the other guy and what happened, how did the accident happen? He [appellant] said the car was in the middle of the road. He couldn't stop in time, he just appeared in the middle of the road.

\* \* \* \* \* \*

He [appellant] said he was going down the road and all of [a] sudden this guy appeared in the middle of the road, crossing like that. He just tried to stop—he tried to avoid it once, you know, go to the left or right. I don't remember which way he was trying to turn and he just couldn't stop on time or the car didn't stop on time, really.

Mr. Bohling testified at some length about his conclusions. He did not physically examine the vehicles, but based his calculations and opinions on photographs of the vehicles and measurements taken by the officers on the scene. Primarily, he was able to draw conclusions about the speed of appellant's vehicle at the point of impact. Based upon the information available to him, Mr. Bohling estimated the speed of appellant's vehicle at the point of contact to be between 112 and 130 kilometers per hour (about 69.6 to 80.8 mph). The posted speed limit on the highway was 100 kph (about 62.15 mph). Mr. Bohling could not estimate the vehicle's speed prior to contact; he agreed it may have been greater.

Mr. Bohling was less sure about his other opinions, which were obviously based on assumptions. For example, he concluded that Mr. Strubbe commenced a U-turn across the right of way just 1 to 1 1/2 seconds before appellant's car struck. In reaching this opinion, he assumed several things. First, he assumed that Mr. Strubbe had just commenced a U-turn maneuver. Also, he assumed that Mr. Strubbe would have been turning at a rate of about 10 to 15 kilometers per hour, although there was no physical data or method with which to confirm this supposition.

There seems to be little reason to doubt that Mr. Strubbe's vehicle was somehow athwart the road; but exactly how and when he got there was a matter of some conjecture. Appellant's statement to the police that he first saw the vehicle at the right side of the road and struck him when he pulled abreast would support the theory of a U-turn just commenced. But exactly when appellant would have first seen the vehicle and when it would have commenced its turning movement is not clear. Further, appellant's statement to Specialist Compilo that "all of [a] sudden this guy appeared in the middle of the road, crossing like that" is somewhat at odds with statement to the police and further obscures the question of when Mr. Strubbe might have commenced the movement.

Mr. Bohling also endeavored to calculate appellant's distance from the Strubbe vehicle at the assumed moment Mr. Strubbe commenced this movement. In doing so, Mr. Bohling further assumed that appellant's speed prior to impact was the same as his speed at impact. Based on these assumptions, Mr. Bohling calculated that appellant's vehicle would have been between 30 to 36 meters away from Mr. Strubbe's vehicle at the moment Mr. Strubbe commenced his turn. These assumptions led Mr. Bohling to conclude that it was physically impossible for appellant to avoid the collision at the assumed speed of approach. Moreover, based on the same

assumptions, Mr. Bohling calculated that appellant would have been just 3 meters further away at the moment Mr. Strubbe commenced his turn if appellant had been traveling at the posted speed of 100 kph. If so, appellant still could not have avoided the collision, although the point of impact on Strubbe's vehicle would have been further to the rear, and the vehicle might not have split apart. The expert could not project the nature of injuries the deceased would have sustained if his vehicle had been struck further to the rear at a lawful speed.

These opinions of Mr. Bohling—based on suppositions and assumptions, and of which he was admittedly unsure—led appellant to contend that his conduct was not the "proximate cause" of the deceased's injuries.

Article 111 provides:

Any person subject to this chapter who operates any vehicle while drunk, or in a reckless or wanton manner, or while impaired by a substance described in section 912a(b) of this title (article 112a(b)), shall be punished as a court-martial may direct.

The President, in the Manual for Courts–Martial, United States, 1984, lists the following as elements of the offense:

(1) That the accused was operating a vehicle; and

(2) That the accused was drunk while operating the vehicle, that the accused operated the vehicle in a reckless or wanton manner, or that the accused was impaired by a substance described in article 112a(b) while operating the vehicle.

In addition, "[I]f injury resulted," the Manual authorizes this "element":

(3) That the accused thereby caused the vehicle to injure a person.

Para. 35b, Part IV, Manual, *supra.*

■ Several observations may be made immediately. First, the third "element" listed in the Manual is not an element of the offense of drunk or reckless driving.

That offense is complete with or without injury. However, acting pursuant to his authority to prescribe maximum punishments, Article 56, UCMJ, 10 USC § 856, the President has differentiated the maximum punishment levels for drunken or reckless driving as follows:

(1) *Resulting in personal injury.* Dishonorable discharge, forfeiture of all pay and allowances, and confinement for 18 months.

(2) *No personal injury involved.* Bad-conduct discharge, forfeiture of all pay and allowances, and confinement for 6 months.

Para. 35e, Part IV.

■ Thus, the third "element" merely establishes a hierarchy of maximum sentence levels within the statutory offense of drunk or reckless driving. *See United States v. Scranton,* 30 MJ 332 (CMA 1990). This differentiation of sentence levels based on injury or absence of injury dates back at least to 1951. *See* para. 127c, Table of Maximum Punishments, Manual for Courts–Martial, United States, 1951; and Manual for Courts–Martial, United States, 1969 (Revised edition). In the 1984 Manual, however, the maximum potential confinement where injury resulted was raised by 6 months to the present level.[1]

The second observation is that the specification of Article 111 originally alleged that appellant

did ... operate a vehicle, to wit: a passenger car, while drunk or impaired by alcohol, *and in a reckless manner by driving* at a speed in excess of the posted speed limit and did thereby cause said vehicle to strike and kill Jens Strubbe.

(Emphasis added). The military judge found appellant not guilty of the emphasized words, but guilty of the remainder of the specification. Reference again to the elements of Article 111 discloses that mere excessive speed, absent recklessness or wantonness, is not a component of the of-

---

1. As the "elements" are set out in the 1984 Manual, the casual reader may be misled to think that this additional provision is an element of the offense. The proper relationships were perhaps more clearly reflected in the 1951 and 1969 Manuals, where the provision was simply listed in the Table of Maximum Punishments.

fense.[2] That leaves appellant convicted of drunken driving, thereby causing the fatal injury.

The third observation deals with the nature of the sentence-escalating "element." To reiterate, it states:

That the accused thereby caused the vehicle to injure a person.

■ The question is, under what circumstances can it be said that an accused "thereby caused" a vehicle to injure another within the meaning of the provision? The Manual provides no guidance. Appellant argues that the prosecution is required to prove that his conduct was the "proximate cause" of the fatal injury and that the deceased's own negligent conduct was an "intervening cause" such as to negate proximate cause and relieve appellant of liability.[3] *See United States v. Cooke,* 18 MJ 152 (CMA 1984); *State v. Ruyle,* 234 Neb. 760, 452 N.W.2d 734, 741–46 (1990). On the other hand, the Government maintains it need only prove that appellant's conduct was a cause-in-fact of the injuries. Further, the Government argues, even if "proximate cause" was required, it was proved here.

■ Working admittedly without the benefit of drafters' guidance, we must reject the Government's contention that it merely has to show appellant's conduct as a cause-in-fact of the injuries to qualify for the higher level of punishment. If that were the case, then circumstances and occurrences totally outside the range of foreseeability and culpability would expose servicemembers to higher levels of punishment. This, we believe, would cause arbitrary sentencing and would not fulfill Presi-

dential intent. For example, had it been a parachutist that dropped suddenly out of the sky in front of appellant's vehicle (assuming appellant had no reason to know he was in the middle of a drop zone) and had the circumstances been such that no one driving lawfully and exercising all due care could have avoided striking the parachutist given the minimal notice, it would not have been the fact of the drunken driving that "thereby caused" the injury.

Similarly, if one bent on self-destruction had hidden behind an obstacle by the roadside and had hurled himself into appellant's on-rushing vehicle, and the same result would have occurred had the driver been sober and driving with all due care, it would not have been the fact of the drunken driving that "thereby caused" the injury. It would appear that such accused should only be punished for their drunken driving—that something more than cause-in-fact should have to be shown to subject them to the higher punishment ceiling.

The problem arises when, as here, there is ample evidence of the accused's misconduct (*i.e.,* drunken driving) and the consequences that followed were precisely the sort contemplated by the proscription, but negligent actions of a third party may have contributed to the unfortunate result. *United States v. Cooke, supra,* was a case in which we resolved such an issue. Admittedly, Cooke was convicted of involuntary manslaughter under Article 119, UCMJ, 10 USC § 919, and one of the elements of the *offense* was "[t]hat ... death resulted from the act or omission of the accused." Para. 198*b,* 1969 Manual, *supra.* Cooke argued that the military judge erred

---

2. Obviously, excessive speed can be highly probative of recklessness or wantonness. However, the military judge here evidently did not find appellant's speed to have risen to the level of recklessness, and there was abundant testimony in the record that the speed level proven, though not within the *posted* rate, was nevertheless within the *customary* rate of travel in that community. Arguably, excessive speed could corroborate drunken driving as well.

3. Historically, these sentence "elements" are pleaded in the specification and proved in the

same manner as offense elements. Therefore, in order to subject an accused to these higher potential maximum sentences, the prosecution must prove sentence "elements" beyond a reasonable doubt—at findings. *See United States v. Beene,* 4 USCMA 177, 182, 15 CMR 177, 182 (1954). Admittedly this practice represents something of an anomaly—and a windfall to an accused. *See McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986); *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

in failing to give an intervening-cause instruction. We allowed that the judge should "have indulged the defense in this instruction" under the circumstances, but we concluded that the failure to instruct was nonprejudicial on those facts. 18 MJ at 155.

In the instant case, absent some superior suggestion, we can think of no better way to interpret the intendment of this "sentence element" than in standard "proximate-cause" terms. As we noted in *Cooke:*

> To be proximate, an act need not be the sole cause of death, nor must it be the immediate cause—the latest in time and space preceding the death. But a contributing cause is deemed proximate only if it plays a material role in the victim's decease.

18 MJ at 154 (*quoting United States v. Romero*, 1 MJ 227, 229 (CMA 1975)). Further, an intervening cause excuses an accused from his criminally-negligent conduct when

> the second act of negligence looms so large in comparison with the first, that the first is not to be regarded as a substantial factor in the final result.

18 MJ at 154; *see* R.Perkins and R.Boyce, *Criminal Law* 787 (3d ed.1982).

■ Whether appellant's drunken driving "play[ed] a material role in" Mr. Strubbe's demise or whether Mr. Strubbe's own alleged negligence "loom[ed] so large" as to relegate appellant's conduct to less than "a substantial factor in the" death are calls to be made in the first instance by the factfinder.

We note that the military judge did not have to accept all or any of the expert's conclusions. Separate and apart from these conclusions were the photographs of the scene of the collision and of the wrecked vehicles, and the measurements taken by the officers on site. We have no reason, however, to believe that the judge discounted any of the expert's testimony, and he need not have done so to find appellant guilty. Notwithstanding everything the expert opined, the judge could have concluded that, *by reason of appellant's state of intoxication,* he either saw the deceased's vehicle far enough in advance to take reasonable measures to avoid the fatal consequences—but he failed to do so—or he did not see the deceased's vehicle in time—but he should have.

■ Along these lines, the judge could have considered, or discounted altogether, appellant's seemingly contradictory statements as to whether or when he saw the deceased's car. A factfinder is never required to believe any witness or statement, and appellant's obvious misrepresentation about how much alcohol he had consumed would presumably have caused the judge to view any statement made by appellant with great suspicion. Further, as it was apparently a clear night with no obstruction of vision on the highway, the judge could have considered that the deceased's vehicle should have been readily visible with its lights on and that there was no evidence at all of deceleration prior to impact. Finally, the judge could have concluded that, even if the collision could not have been avoided entirely, the fatality could have been avoided had appellant been sober and driving with due care.

Under the circumstances, the judge did not err as a matter of law in concluding that appellant's misconduct was a material factor in Mr. Strubbe's death and that the deceased's actions did not "loom[ ] so large" as to relieve appellant entirely of criminal liability.[4] Thus appellant's conduct "thereby caused" the fatal injury, within our reading of the Manual, permitting his exposure to the higher level of punishment.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.

---

4. Obviously, Mr. Strubbe's own possible contribution to his death would have been taken into consideration on sentencing. We note, in any event, that the sentence as reduced by the Court of Military Review now falls within the limitation of drunken driving without injury resulting.