**UNITED STATES, Appellee,**

v.

**Manuel LOYA, Jr., Lance Corporal,
U.S. Marine Corps, Appellant.**

No. 97–0616.
Crim.App. No. 95–02208.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 4, 1998.

Decided Sept. 23, 1998.

For Appellant: *Lieutenant Jeffrey K. Van Nest,* JAGC, USNR (argued); *Lieutenant Commander Eric C. Price,* JAGC, USN.

For Appellee: *Lieutenant Russell J.E. Verby,* JAGC, USNR (argued); *Colonel Charles Wm. Dorman,* USMC, and *Commander D.H. Myers,* JAGC, USN (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

Appellant was tried by a general court-martial composed of a military judge sitting alone at Rota, Spain, on September 4 and 5, 1995. He was charged with murder, in violation of Article 118(3), Uniform Code of Military Justice, 10 USC § 918(3). He pleaded guilty to and, after trial on the merits, was found guilty of involuntary manslaughter, in violation of Article 119, UCMJ, 10 USC § 919. He was sentenced to a dishonorable discharge, 5 years' confinement, total forfeitures, and reduction to E–1. The convening authority approved this sentence on November 9, 1995. The Court of Criminal Appeals affirmed on January 31, 1997.

On August 27, 1997, this Court granted review on the following issue of law:

## WHETHER THE MILITARY JUDGE ERRED BY EXCLUDING EVIDENCE IN SENTENCING OF MEDICAL TREATMENT GIVEN THE VICTIM.

We hold that the military judge prejudicially erred in excluding the defense evidence proffered to show the poor medical treatment provided the victim of appellant's culpably negligent conduct. *See* RCM 1001(c)(1)(A), Manual for Courts–Martial, United States, 1984; *United States v. Taylor*, 44 MJ 254 (1996); *United States v. Lingenfelter*, 30 MJ 302, 307 n. 4 (CMA 1990).

Appellant was charged with the murder of Private Jose A. Navedo, USMC, by stabbing him in the chest with a knife, in violation of Article 118. He was found not guilty of this offense, but guilty, in accordance with his pleas, of the lesser offense of involuntary manslaughter for killing him "by culpable negligence." Art. 119(b)(1). The record basically shows that appellant stabbed Private Navedo in the chest with a "butterfly knife" while "playing" with it. He stated:

ACC: I started trying to work the knife as he [Navedo] showed me. It's a—everything that happened is a blur, I remember afterwards, I saw a knife in his chest. Playing around—or using a knife sir, I didn't think it could happen, what happened—in my head that it could happen. I wasn't thinking about it. I couldn't believe the knife was in his chest so I pulled it out and I tested the blade like it was one of those fake knives, sir. This was going through my head that the blade just pushes in or something so I put it against my hand. I pushed it against my hand and it pricked my hand. I looked at Navedo and his eyes—he was in shock, he bent over, sir. I grabbed him and started yelling for help. I started walking toward the upper V, the ramp. Got closer to the ramp, sir. He leaned against the wall. He started sliding down the wall. I laid him down, and started yelling for a blouse to put underneath his head. Somebody gave me a canteen so I put it underneath his head. I was still holding his head in my hand, sir. I was yelling at him to stay awake, to keep his eyes open; at the same time, I was applying pressure to the wound, trying to stop the bleeding, sir, talking to him. I remember people asking me what happened. I told them it was an accident that I stabbed him, that there was an accident. The medical emergency team arrived. I got up, looked down and looked at him, went and stood on the ramp, squatted down. A little while after that, one master at arms showed up and asked me what happened, and all I said was that it was an accident. He took me to the MAA's office there.

During the sentencing portion of this court-martial, the defense called Lieutenant Commander (LtCdr) Michael Ivy, USN, MD. Doctor Ivy was the general surgeon on Fleet Surgical Team 4, and he served aboard the USS KEARSARGE on the day in question. He gave testimony concerning the medical treatment which was given to Private Navedo and proffered testimony as to medical treatment which should have been given to him. Trial counsel objected to this line of questioning, and defense counsel explained his position on admissibility of this testimony, stating:

*We'd like to put forth to this court exactly what was the medical treatment which was administered to Private Navedo, the quality of that medical treatment, the timeliness of the operation, and whether or not Private Navedo would have had a chance to survive had things been done differently that day. Therefore, this is extenuating and mitigating, sir.*

TC: Sir, looking at [RCM] 1001, particularly in matters that deal with matters in extenuation, I'll read it verbatim, "a matter in extenuation of the defense [sic] serves to explain the circumstances surrounding the commission of the offense including the reasons for committing the offense which do not constitute a legal justification or excuse." This testimony in no way meets that definition of extenuation evidence.

DC: In fact what the Government has introduced—

MJ: Excuse me, why don't I just go ahead and excuse the doctor, and we'll discuss this outside his presence. We'll be back with you momentarily.

The witness exits the courtroom.

MJ: Go ahead, counsel, I'm sorry.

DC: Yes, sir. First of all, we believe that on some merit [sic] that *this evidence shows extenuating and mitigating factors in that if the medical treatment which was applied was not adequate or was not timely, then possibly Jose Navedo would be here and if we're to judge how to sentence someone for murdering [sic] a victim, we should know whether or not, indeed, that victim could have been saved had the circumstances been any different.* Secondly, the Government has already proposed, at least to me, that they are going to introduce evidence of victim impact. They are going to show you autopsy photographs and that sort of thing and, therefore, we believe that the adequacy of medical care would be in direct rebuttal to the Government's evidence.

MJ: Counsel, the thing that concerns the court is that you have entered a plea of guilty to involuntary manslaughter in this case which the court has accepted, yet— are you suggesting that the acts of your client were not the proximate cause of the death of Navedo?

DC: No, sir. They were definitely the proximate cause. However, as this court is aware, there can also be other causes which produce the death of Private Navedo, and we are not saying that these other causes rise to the level of intervening cause so as to break the chain of events and therefore render him not guilty. *What we are saying is that there are other contributing factors.* The Government has tried several times today in court to show that this was a very serious injury, that it was intentionally caused, and that this is the type of injury that demonstrates a wanton disregard. Therefore, we believe it is important to tell the court how serious is this injury, could it have been treated? Was it treated properly? And that directly answers the Government's supposition here today. *But it is not enough of a contributing factor—sir,* Commander Ivy will tell you—if not in answer to my question, I'm sure in answer to Captain Carberry, that this is normally a very serious

wound and it is usually, and if you can say that, usually fatal. And therefore his plea is provident as to whether or not he proximately caused the death. *But whether or not there are other contributing factors, I think this court should look at in trying to decide whether or not this is mitigating evidence.*

MJ: Captain Carberry?

TC: Sir, it's clear that Lance Corporal Loya's actions were the instrumentality that caused Private Navedo's death. We would reiterate that we don't believe that this is a proper matter in extenuation given on the clear and unambiguous reading of RCM 1001. Secondly, we would question the relevance of it if the doctor's going to come up there and testify that it's usually fatal and it's a serious injury. There's nothing extenuating or mitigating about that, sir.

DC: Again, according to 1001, we believe this is extenuating and mitigating in nature and, secondly, we would ask this court to relax the rules of evidence in accordance with 1001.

MJ: Counsel, in your offer do you intend—are you trying to offer evidence that the doctor was somewhat negligent in his treatment?

DC: Not this doctor, sir. Sir, if I may make a very brief offer of proof. Very briefly, there were two doctors. *This witness has told you that there was one Commander who was in charge and he was assistant to that Commander. And there was a disagreement as to what should be done in the treatment of Private Navedo. And this doctor will tell you what his opinion is and whether or not Private Navedo would have had a greater chance of surviving having followed his line as opposed to the other Commander's.*

TC: Yes, sir, what I think we're talking about are two professionals who have a difference of opinion as to a course of treatment, and the other thing that we have to be wary of is the fact that we're giving [sic] into speculative testimony as to what may or may not have been the out-

come had a particular course of action been taken.

DC: And to answer that sir, this is an expert. He's entitled to give his opinion. He is not going to stand up in this courtroom and tell you exactly what the percentage of survival would have been. However, he will tell you that his chances were greater just based on the decline of the condition of Private Navedo. And, the Government is free to call the other doctor if they would like, as is usually done in courts-martial. We have a battle of the experts for your review, Your Honor.

MJ: I'm going to sustain the objection. *The only way this would be relevant is if you were attempting to show, in defense of your client on the merits, that he was not the key ... his act was not the proximate ... his action was not ·the proximate cause of death. I don't see the relevancy, in this case in sentencing, of this testimony.* And you've indicated to the court that you're not asserting, after having discussed it with the doctor and fully aware of all that's occurred, that there's any problem with the proximate-cause issue. Is that correct?

DC: Yes, sir, because the doctor's not going to come in and say our mistake caused the death of Private Navedo because obviously the knife wound did. *However, whether or not there are contributing factors we believe that it's relevant, and on that basis we offer this evidence.*

MJ: I'm going to sustain the objection. I don't believe it's relevant ...

(Emphasis added.)

— — —

Article 36, UCMJ, 10 USC § 836, provides that the President may prescribe "trial ... procedures, including modes of proof," for trials by courts-martial. RCM 1001(c)(1) states, in pertinent part, the following:

(c) *Matter to be presented by the defense.*

(1) *In general.* The defense may present matters in rebuttal of any material presented by the prosecution and may present matters in extenuation ·and mitiga-tion regardless. whether the defense offered evidence before findings.

(A) *Matter in extenuation. Matter in extenuation of an offense serves to explain the circumstances surrounding the commission of an offense, including those reasons for committing the offense which do not constitute a legal justification or excuse.*

(B) *Matter in mitigation. Matter in mitigation of an offense is introduced to lessen the punishment to be adjudged by the court-martial, or to furnish grounds for a recommendation of clemency.* It includes the fact that nonjudicial punishment under Article 15 has been imposed for an offense growing out of the same act or omission that constitutes the offense of which the accused has been found guilty, particular acts of good conduct or bravery and evidence of the reputation or record of the accused in the service for efficiency, fidelity, subordination, temperance, courage, or any other trait that is desirable in a servicemember.

(Emphasis added.) Both the military judge and the Court of Criminal Appeals held that the quality of medical care provided to Private Navedo was not a relevant matter for the sentencing authority to consider in sentencing appellant for negligently killing him. We disagree.

To be admissible evidence must be relevant. Mil.R.Evid. 402, Manual, *supra.* Relevance is defined in Mil.R.Evid. 401, which states:

**Rule 401. Definition of "relevant evidence"**

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Here, appellant was found guilty of a homicide offense based on reckless conduct which could "foreseeably result in the death of another." *See* para. 44c(2)(a)(i), Part IV, Manual, *supra.* LtCdr Ivy's testimony tended to show additional facts and "circumstances surrounding" the death of the victim which

would provided a full or complete picture of this tragic event. *See United States v. Silvis*, 33 MJ 135, 137 (CMA 1991). Moreover, the defective-degree-of-care evidence explained that others may have contributed to the death in question, a fact which might logically reduce appellant's blame. *See Taylor*, 44 MJ at 257 ("degree of care" relevant on causation, an element of criminally negligent homicide); *Lingenfelter*, 30 MJ at 307 n. 4 (victim's "contribution to" own death is relevant matter in sentencing). We conclude that the military judge abused his discretion in determining this evidence was not relevant.

■ The judge's error in refusing to consider this defense-extenuation and mitigation evidence does not automatically require setting aside appellant's sentence. Prejudice to the accused in the sentencing decision is required. Art. 59(a), UCMJ, 10 USC § 859(a); *see United States v. Adams*, 44 MJ 251, 252–53 (1996). For the reasons noted below, we are persuaded that appellant's sentence was substantially affected by exclusion of this evidence, so a new sentence hearing must be ordered. *See United States v. Hysong*, 47 MJ 126, 127 (1997) (significant-impact test).

First, we note that this was a homicide case, and no evidence of other circumstances was admitted which could lessen the blame of appellant for the tragic death of Private Navedo. *Cf. United States v. Velez*, 48 MJ 220 (1998). Second, the military judge made clear on the record that he believed appellant

was the sole cause of this unnecessary loss of a fellow Marine's life. ("He's dead because of your senseless and reckless conduct, playing around with a dangerous knife.") Third, appellant received the most severe form of punitive discharge, the maximum amount of forfeitures, the lowest reduction, and a substantial prison sentence of 5 years (one-half the maximum period of confinement). *See United States v. Zakaria*, 38 MJ 280, 284 (CMA 1993). Finally, no sentence adjustment was made by the convening authority which might be construed as remedial action for this error. *See United States v. Martinsmith*, 41 MJ 343, 349 (1995).

The decision of the United States Navy–Marine Corps Court of Criminal Appeals as to findings is affirmed. The decision as to sentence is reversed, and the sentence is set aside.* The record of trial is returned to the Judge Advocate General of the Navy. A rehearing on sentence may be ordered.

Judges CRAWFORD and EFFRON concur.

GIERKE, Judge (concurring):

I agree with the rationale and result in this opinion. I write separately to make clear that I decline to join in the author's personal footnote below.

COX, Chief Judge (dissenting):

I admit at the outset that I write with the bias of a trial judge. I admit that the majority opinion has a basis for its conclusion that the proffered evidence could have been ad-

---

* Expressing the view of the author judge only, I respond to the dissent of my Brother with three words—"Truth in Sentencing." Initially let me say I applaud and agree with Chief Judge Cox to a certain degree. I *applaud* Chief Judge Cox's honesty in stating his bias toward the trial judge up-front in his opinion. In addition, I *agree* with some of his common sense observations of the mechanics of trial practice. Nevertheless, I find his result flawed because he ignores the bottom line in the case—evidence was kept out which prevented a true sentence.

In this case, the judge was the factfinder for the sentence. The judge kept key medical evidence out of the record—evidence that medical malpractice was a major factor in the death of the victim; evidence the judge would have been forced by his duty to consider; evidence that

appellant could have argued in his closing argument at trial before the judge made his decision on the sentence; evidence that could have changed the judge's mind which the judge clearly expressed in giving the sentence: "He [the victim]'s dead *because* of your senseless and reckless conduct, playing around with a dangerous knife." (Emphasis added.)

In this case, although I applaud and agree with some of Chief Judge Cox's opinion, I cannot join him because there was legal error here. The judge kept out evidence that this appellant had a legal right to put into his case and had a legal right to argue. The factfinder's sentence is suspect to me because the factfinder didn't have all the facts to consider. I cannot say the sentence is a true one. I'm sorry Chief Judge Cox feels it is.

mitted under RCM 1001(c)(1)(A), Manual for Courts–Martial, United States (1995 ed.), as evidence to explain the facts and circumstances surrounding the offense. Indeed, the most common form of admission of this type of victim-suffering evidence is in aggravation. *See* RCM 1001(b)(4) and RCM 1004 (death-penalty evidence). That is where I stop.

This case is every trial judge's nightmare. It provides an excellent scenario for a sentencing seminar for trial judges who enjoy discretionary sentencing and who are not bound by sentencing guidelines. Let's turn briefly to the facts.

The accused offered evidence that the junior attending physician believed that, if the senior attending physician had performed a different procedure, the victim *may* have been saved. The military judge ruled that the evidence was inadmissible because— while it was relevant to the question of criminal liability, *i.e.*, it may have shown an intervening or contributing cause of death—it was not relevant to the question of an appropriate sentence. That ruling is the basis of the majority opinion's view that this ruling constituted reversible error.[1]

I would affirm for the following reasons:

1. This case really is one that falls under Mil.R.Evid. 403, Manual, *supra*. The proffered testimony was taking the trial directly to a civil malpractice case, right in the middle of a criminal sentencing hearing. Does anyone really believe that the Government was going to sit idly by and let the junior physician take a free shot at his superior officer? Of course not! At a minimum, the Government would have called the senior physician and possibly may have tried to call the Chief of Thoracic Surgery at the National Naval Medical Center of Bethesda, Maryland; the President of the American College of Thoracic Surgeons; and the forensic pathologist

who did the autopsy—if one was done—in order to prove that medical malpractice did not cause the victim's death. Death was caused by the fatal stab wound. Even if all of these witnesses had conceded that another procedure *might* have saved the victim, they also would likely have agreed that the procedure used *might* have saved the victim.

This is a classic example of a trial within a trial. I shudder to imagine how this case would have been managed before members. I assume the majority would sit back and enjoy the malpractice litigation with all of the experts discussing standards of care and the myriad procedures available to doctors to treat stab wounds.

In any event, the trial judge simply should have ruled that any probative value to be gained by the speculative testimony of the junior physician was far outweighed by the danger of confusion and waste of time on collateral issues. Therefore, the testimony was inadmissible under Mil.R.Evid. 403. This ruling would have been tested for abuse of discretion and, to paraphrase the junior doctor, it would have had a better chance of surviving the appeal.

2. I also would affirm the military judge's decision because of my experiences as a trial judge and my involvement with numerous sentencing cases. I have referred to these experiences as "Lessons from the Junkyard."[2] As some anonymous person said, "One man's junk is another man's treasure." My reading of this record suggests that the military judge, who after all was the person doing the sentencing, did not regard this speculative testimony as matter in extenuation and mitigation to the sentence in this case. When the smoke cleared, there was only one person who could determine if this controversy between the physicians was relevant to the existence of any fact of conse-

1. Based upon his footnote, it is apparent that Judge Sullivan has convicted the lead physician of malpractice. *See generally United States v. Billig*, 26 MJ 744 (NMCMR 1988). He altogether misses the point of my dissent. Furthermore, what is "truth in sentencing"? Would the judge give a higher sentence if he concluded there was no malpractice?

2. I first heard the title, "Lessons from the Junkyard," from either the late, Honorable Julius B.

"Bubba" Ness, Chief Justice of the South Carolina Supreme Court, or from the Honorable Rodney A. Peeples, Resident Judge of the Second Judicial Circuit of South Carolina. Both of these distinguished jurists have dedicated considerable time and energy to teaching judges how to be judges.

quence regarding the determination of the sentence in this case: that was the military judge. Mil.R.Evid. 401 and 402. The judge said, "I don't see the relevancy, in this case in sentencing, of this testimony." Why do we make judges accept evidence that, in their judgment, is not relevant? It beats me!

3. The third reason I would affirm is that, even if the military judge did abuse his discretion by preventing the junior physician's testimony, the error was clearly harmless in this trial before military judge alone. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

Having said all this, I would remind military judges of two rules that should always be followed. These rules come from "Lessons from the Junkyard."

### RULE 1

A TRIAL JUDGE WILL NEVER BE REVERSED FOR LETTING IN DEFENSE EVIDENCE ON SENTENCING.

### RULE 2

A TRIAL JUDGE WILL NEVER BE REVERSED FOR EXCLUDING GOVERNMENT EVIDENCE ON SENTENCING.

Reversal on appeal could have been easily avoided if the military judge simply had said: "Counsel, it appears to me that this evidence is of limited value because it is speculative, and it would simply create a mini-trial within this trial. Nevertheless, I will accept your proffer counsel, and hear what the good doctor has to say. However, I am not going to turn this trial into a malpractice case, so that is as far as this is going to go." If the military judge had done that, he would have confronted trial counsel's effort to put on counter evidence to rebut.

Trial counsel need to understand, however, the human dynamics that go into sentencing. It is highly unlikely that this judge was going to decrease the sentence because the doctors could not agree on the procedure to use to try to save the victim. This case was treated as a serious accident, involving a dangerous weapon, and appellant was sentenced accordingly. *See generally United States v. Kinman*, 25 MJ 99, 102, 104 n. 3 (CMA 1987) (Cox, J., dissenting).