UNITED STATES, Appellee

v.

LESTER CRAIG, Corporal, U. S. Army, Appellant

2 USCMA 650, 10 CMR 148

No. 1249

Decided June 24, 1953

Lt Col Stewart H. Legendre, U. S. Army, Lt Col George M. Thorpe, U. S. Army, and 1st Lt John W. Fuhrman, U. S. Army, for Appellant.

Lt Col Thayer Chapman, U. S. Army, and 1st Lt Robert A. Forman, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

This case is before us on petition by the accused to review the record of his conviction for three offenses committed in violation of the Uniform Code of Military Justice. He was tried by general court-martial at Pusan, Korea, for the offenses which occurred on August 4, 1951. The charges alleged: (1) premeditated murder by shooting another enlisted man; (2) robbery of a carbine from a Korean National; and (3) assaulting a Korean girl by shooting her in the left arm, in violation of Articles 118, 122 and 128, 50 USC §§ 712, 716 and 722, respectively. He was found guilty of the offenses, however, the court-martial amended the third specification by substituting the words "shooting at" the girl for "actually wounding her." He was sentenced to a dishonorable discharge, total

652

forfeitures and life imprisonment. The convening authority approved and a board of review affirmed.

We granted accused's petition for review limited to a consideration of (1) whether the evidence required the law officer to instruct on the lesser included offenses and (2) whether he erred by failing to instruct on intoxication. Because of the nature of the issues involved, a brief resume of the facts is required. In this connection we will state briefly and separately the facts relevant to the particular offense under consideration.

In support of the robbery charge, the record shows that at about 6:00 o'clock on the evening of August 4, 1951, the accused went to a Korean saki house where his girl friend, a Korean named In Soon, was staying. While there, he engaged in an argument with her regarding a reported infidelity. The owner of the shop, one Chung, attempted to placate the accused by giving him saki to drink but with little success. Accused then asked In Soon to give him a bayonet knife which she had been keeping for him. He took the knife and departed shortly thereafter. Sometime between 6:30 and 7:00 o'clock that evening, the accused was returning to the house and noticed a Korean policeman armed with a carbine. He followed the policeman a short distance, accosted him, and by threatening him with the knife obtained possession of the carbine. When the accused grabbed the weapon, the policeman, frightened by the knife, released his hold and fled.

The facts supporting the assault charge are these: After accused succeeded in obtaining the carbine from the Korean policeman, he attempted to locate In Soon. He was unable to find her either at Chung's house, where she had been staying, or at the home of a neighbor. Thereupon, he left the area and while he was walking along the street in continuation of the search, a young Korean girl, about eight or nine years of age, approached him. Without any apparent reason or excuse he pointed the carbine at her and fired.

Fortunately the injury was not serious as the bullet grazed her left arm.

Shortly after the above related shooting, the incident giving rise to the murder charge happened. Chung, who had joined accused in his hunt for In Soon, followed him to another saki house where there were several American soldiers. Chung assumed they were friends of accused and after telling them that accused was very drunk he requested they get possession of the carbine. This they refused to do and left. Thereupon, accused and Chung decided to return to the latter's house to ascertain whether or not In Soon had returned. On the way accused threatened a Korean by pointing the weapon at him but he was dissuaded from any further violence by assurances from Chung that he was a friend. They arrived at the house about 9:00 o'clock and Chung observed two men standing inside. He told accused to wait by the gate until he determined their identity. The accused, however, left the gate, entered the house by the rear door, noticed two American soldiers in the house, pointed the weapon in their direction and ordered them to go outside with him. This they did and when outside, the accused, who was covering them with the carbine, demanded to know what they were doing there. When one of the two replied, the accused fired the carbine. The victim was struck by the bullet, fell to the ground and subsequently died from a wound in the chest. After the weapon was fired, Chung attempted to obtain possession but a scuffle ensued and accused assaulted him with the knife. After being cut three times, Chung fled.

## I

The issue of whether an instruction should have been given on the lesser offenses of assault with a █ dangerous weapon, which arose out of shooting at the young Korean girl, can be disposed of with little difficulty. The only lesser offense under such a charge is simple assault upon which, under the facts and circumstances of this case, no instruction was required. The evidence is clear that the accused perpetrated

an aggravated assault upon the victim by shooting at her with the carbine. This offense does not require a specific intent and so the record is barren of any fact or circumstance which would tend to lessen the gravity of the offense. There being no offense other than that charged which was reasonably brought into issue by the evidence, we reject this contention.

## II

The next question posed is whether an error was committed by the law officer in not instructing on the lesser offenses included in the robbery charge. Those offenses, if established by the evidence, which may be included within that charge are larceny or wrongful appropriation, assault with a dangerous weapon, or assault with intent to commit robbery or larceny. We do not see how the evidence in the case raises any issue as to the offenses of larceny, wrongful appropriation or assault with intent to commit either larceny or robbery. Here the accused by using a bayonet knife in a threatening manner instilled within a Korean policeman sufficient fear and apprehension that he relinquished possession of his gun and fled. There was a taking by means of force and fear. No offense other than that of robbery can be supported by the evidence, unless intoxication raises an issue of the accused's capacity to form a specific intent and then the crime would be reduced to one not involving that particular intent. This, for the reason that if accused's mental faculties were so impaired by intoxicants that he could not form the specific intent to steal, he was not guilty of the greater offense of robbery or any lesser included offense requiring the same mental capacity. This eliminates all included offenses reasonably established by the evidence except an assault with a dangerous weapon which requires only a general criminal intent. However, as we will later show, the evidence of intoxication was of such quality and quantity that an issue was fairly raised and so we call attention to the rule that the court-martial may take this factor into account when deliberating on a charge of robbery.

In a very similar situation the New York Court of Appeals in People v. Koerber, 244 NY 147, 155 NE 79, stated:

"We now come to consider the charge against defendant as affected by his intoxication. Disregarding for the moment the statutory modification of common-law rules and principles and the fine distinctions not applicable hereto, we find that the gist of robbery is larceny by force from the person (Penal Law, §§ 2120, 2122), and that the gist of larceny is the taking and carrying away of personal property of another with the specific intent to steal such property (Penal Law, § 1290). If on an indictment for larceny or robbery the testimony leaves uncertain the intent with which the accused took the property, the jury should be instructed to give the defendant the benefit of the doubt. Thorne v. Turck, 94 NY 90, 95, 46 Am Rep 126. That the intent is usually to be inferred from the act does not change the rule that a taking without intent to steal is not larceny at common law. No statutory larceny is involved in the consideration of the instant case.

"Robbery, as thus defined, is 'a particular species . . . of crime' of which 'the actual existence of any particular . . . intent is a necessary element' within the meaning of Penal Law, § 1220. It follows that the jury should have been instructed 'to take into consideration the fact that the accused was intoxicated at the time, in determining the . . . intent with which he committed the act.' The fact that the accused did not have the intent to rob would not mean that an acquittal should follow. It is conceivable, for example, that a youth whose mind was befuddled by drink might intend merely to stage a holdup and yet be guilty of some degree of homicide. He might be so frightened by resistance as to shoot in the heat of passion, the emotion of fright, and thus be guilty of manslaughter in the first degree, or con-

ceivably even of murder in the second degree. The jury would have to say under proper instructions as to the degree of crime."

The rationale of that opinion has been applied by us in other cases and because the record contains substantial evidence of intoxication, we hold the law officer committed error when he failed to instruct on the elements of assault with a dangerous weapon.

### III

Before pursuing a discussion on intoxication, we dispose of the contention that the law officer erred in not instructing on the offenses included within the premeditated murder charge. Accused was charged with the premeditated murder of Private First Class Donald J. Hammond, by shooting him with a carbine. At the conclusion of the trial the law officer gave full and complete instructions on the offense of premeditated murder, specifically defining the word premeditation. In addition, he explained the elements of an unlawful killing without premeditation and at the request of defense counsel stated that the latter instruction covered the offense of unpremeditated murder. He also informed the members of the court-martial that the lesser offenses which might be included within a charge of murder were manslaughter, negligent homicide in violation of Article 134, 50 USC § 728, and certain other forms of assault. However, he failed to give any details as to the elements of these offenses.

Leaving aside, for the purpose of this discussion, any consideration of the evidence on intoxication, we conclude that the two offenses which were fully defined by the law officer in his instructions, namely, premeditated and unpremeditated murder, were the only ones under the specification which were reasonably put in issue by the evidence. Since accused did not take the stand and offered no other evidence in his defense, we are left with only the version told by the prosecution witnesses. There is no evidence excusing or justifying the killing nor any pointing to provocation on the part of the victim. To consider the acts of accused as negligent, either culpable or otherwise, would approach absurdity. The death of the victim was proved, thus ruling out any consideration of the offenses of assaults with various intents. The record portrays a clear picture of the accused, acting always as the aggressor, ordering two soldiers to the outside of the saki house, demanding to know their reasons for being there and then, without waiting for an explanation of any kind, firing at them with a carbine. Only an offense of murder can be extracted from a record containing those facts and circumstances.

### IV

The issue of intoxication is not easy of solution. The record contains evidence of accused's consumption of a large amount of intoxicating liquor, prior to and during the period the offenses herein occurred, and this evidence is not disputed. The owner of the saki house, who was accused's companion during most of the time, testified that accused drank a large amount of liquor; that he was intoxicated; and that he, the companion, felt compelled to warn several Koreans and soldiers that the accused was very drunk. Other witnesses expressed opinions that the accused was intoxicated. After he was apprehended and sent to the orderly room, he fell asleep and there was some testimony that he was unconscious from the effects of alcohol. His other unaccountable behavior points strongly toward a drunken orgy. Defense counsel, in his argument to the court, referred to intoxication and relied on it in his defense. He quoted authorities on criminal law as to the effect of intoxication upon specific intent. The prosecution did not take issue with the statements and in fairness to the Government, it must be stated that there is no contention that the accused had not been drinking. The assertion is that the evidence did not establish the intoxication had impaired accused's mental capacity to such an extent that he could not form a specific intent. However,

the problem is that the law officer in his instructions failed to inform the court-martial it could consider intoxication.

We previously discussed the effects of intoxication on intent in homicide cases in United States v. Roman (No. 191), 1 USCMA 244, 2 CMR 150, decided March 19, 1952. There we stated our reasons for refusing to hold that failure to instruct the court-martial to the effect that intoxication might be considered to reduce the offense of murder to manslaughter was not error. However, we held it was a proper subject to be considered in making a determination between premeditated and unpremeditated murder. After making reference to previous military and civilian cases, we stated:

"In line with the reasoning of the Bishop case, supra, we believe the better rule to be that if an accused is charged with premeditated murder and there is evidence that he was intoxicated to such an extent that the court-martial could reasonably find that he could not deliberate and premeditate over the intent to kill, that an instruction on the effect of his intoxication should be given. . . ."

Our ruling in that case requires that we hold the law officer erred in failing to instruct the court-martial members that, if they found all other elements present but also found the accused was so intoxicated that he was unable to deliberate and premeditate and form a specific intent to kill, they could return a finding of guilty of unpremeditated murder. Although the record contains sufficient evidence to support the findings of premeditation, we cannot escape the conclusion that had the court-martial members been instructed as to the effect of intoxication upon the mental elements they were to consider in order to convict the accused of premeditated murder, there is a reasonable probability that the finding returned by them would have been in the lesser degree.

By so holding, it must be understood that we are not announcing a rule to the effect that the law officer must instruct on intoxication, regardless of degree. The same test should be applied in determining the necessity of giving an instruction as is applied in other factual issues. Stated generally, the rule is that if there is evidence in the record from which a reasonable man could conclude that the degree of intoxication was such that it would impair the capacity of the accused to form a specific intent, then the instruction must be given. No other hard and fast rule can be prescribed, as such a man may be grossly intoxicated and yet be able to form a premeditated design to kill, while in others, the capacity to form an intent to kill may be blurred by the presence of a lesser degree of intoxication. Only recently we discussed this problem in United States v. Backley (No. 1588), 2 USCMA 496, 9 CMR 126, decided May 12, 1953. Judge Brosman speaking for the Court there stated:

". . . Evidence which goes no further than to indicate merely that the accused 'had been drinking,' or that he was 'under the influence of liquor,' is clearly insufficient to require an unrequested instruction on intoxication. At the far swing of the pendulum, testimony or other evidence suggesting that at the time of the alleged offense the offender was the victim of a temporary drunken frenzy, or in what we once described as 'a state of ambulatory stupefaction,' with equal clarity demands such an instruction. These limits, we believe, must be accepted by all. Indeed, it is only the ground between them which is productive of doubt and uncertainty—and perforce of petitions for review by this Court. As to this area, it may suffice to observe that the showing we contemplate as requiring instruction must certainly be one of *intoxication,*—and, moreover, intoxication *of a certain degree and sort,* characterized by a discernible relationship to the potential absence of a capacity to entertain specific intent. Although intoxication, at least, must be fairly raised, it must be recognized that this condition involves aspects of quality and pitch, and that not every intoxication will necessa-

rily be deemed by us to demand the instructions outlined earlier in this opinion."

## VI

Our reversal of the conviction for premeditated murder does not entirely dispose of the issues in this case. There is again pressed on us the question as to whether under the new Code evidence of intoxication might be considered for the purpose of reducing the offense from unpremeditated murder to one of the degrees of homicide. The touchstone by which we ██ must decide that issue rests in a determination as to whether we desire to retreat from the holding in United States v. Roman, supra, because of the changes made in Article of War 92, 10 USC § 1564, by Article 118, Uniform Code of Military Justice, supra.

In that case we specifically held that evidence of intoxication would not reduce the offense below unpremeditated murder. There we stated:

". . . Generally speaking, premeditated murder in the military equals first degree murder in the civilian, and premeditation and intent to kill are essential elements of that degree. Not so in second degree and unpremeditated murder. Specific intent or premeditation are not ingredients of the offense. . . .

. . . . . . .

". . . We do not conceive drunkenness as a mental condition which will reduce unpremeditated murder to manslaughter. . . .

. . . . . . .

"We conclude that, because the alleged crime was unpremeditated murder, no instruction on intoxication was required . . . ."

"Any person subject to this code who, without justification or excuse, unlawfully kills a human being, when he . . .

At that time we were concerned with the offense as defined by the Articles of War and not the offense as proscribed by the present Code. In the former statute the offense of premeditated murder was merely named and then the Article stated that all other murder would be unpremeditated murder. The specific provision was as follows (Article of War 92):

"Any person subject to military law found guilty of murder shall suffer death or imprisonment for life, as a court-martial may direct; but if found guilty of murder not premeditated, he shall be punished as a court-martial may direct. . . ."

The elements which are mentioned in the Manual for Courts-Martial, U. S. Army, 1949, as necessary to be established are as follows (paragraph 179a):

"(a) That the accused unlawfully killed a certain person named or described by certain means, as alleged (requiring proof that the alleged victim is dead, that his death resulted from an injury received by him, that such injury resulted from an act of the accused, and that the death occurred within a year and a day of such act); (b) that such killing was with malice aforethought, and if alleged, (c) that the killing was premeditated."

In discussing the element of malice aforethought mentioned in subsection (b), that Manual included generally the acts specifically mentioned in the present Article of the Uniform Code. The similarity may be noticed by comparing Article 118 of the Uniform Code of Military Justice, supra, and the discussion of Article of War 92, supra, contained in paragraph 179a, page 231 of the Manual for Courts-Martial, U. S. Army, 1949:

"Malice aforethought may exist when the act is unpremeditated. It may mean any one or more of the following states of mind preceding or coexisting with the act or omission by which death is caused:

(2) intends to kill or inflict great bodily harm; or

An intention to cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not (except if death be inflicted in the heat of a sudden passion, caused by adequate provocation—see 180a) ;

(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

knowledge that the act which causes death will probably cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not, even though such knowledge be accompanied by indifference whether death or great bodily harm is caused, or by a wish that it may not be caused;

(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson . . . ."

intent to commit any felony (see 180d) . . . ."

The change appears to be principally an elimination of malice aforethought and a substitution of the particular acts from which malice could be implied. By way of illustration, in discussing Article of War 92, the 1949 Manual states malice may mean any one or more of the following states of mind preceding or coexisting with the act or omission by which death is caused: (1) an intention to cause the death of, or grievous bodily harm to, any person; (2) committing an act while indifferent to the consequences; and (3) an intent to commit any felony. The three mental states listed in (1) and (3) above are now listed under Article 118 (2) and (4). The one listed under (2) above is now shown in Article 118 (3). From this analysis it appears reasonably certain that by rephrasing Article of War 92, Congress did not intend to change substantially the elements making up the crimes of murder. All we believe that was intended was to separate the different states of mind so as to be more easily dealt with in the trial of cases.

There are jurisdictions which hold that intoxication will reduce the crime of murder to manslaughter and there may be occasions in the future in our system when the facts will show that intoxication combined with other factors, created a situation where a killing caused by heat of passion, might be found to be voluntary manslaughter. However, that situation does not presently concern us. On the other hand, there are jurisdictions which hold that intoxication will not reduce the crime of first degree murder (premeditated) below the level of second degree murder (unpremeditated) for the reason that specific intent is only involved in the greater of the two. In United States v. Roman, supra, we followed the rule announced by the United States Court of Appeals for the District of Columbia in Bishop v. United States, 107 F2d 297, and the doctrine announced in that case limits the reduction to second degree murder. For reasons which hereinafter appear, we believe this to be the better rule for use in the military.

Article 118 provides that when the killing is perpetrated with a premeditated design to kill, or when a killing occurs while an accused is engaged in certain enumerated felonies, the death penalty may be imposed. A killing under other circumstances carries a lesser penalty and in the recent case of United States v. Joe L. Davis (No. 646), 2 USCMA 505, 10 CMR 3, decided May 14, 1953, we concluded that under appropriate factual situations, the of-

fenses proscribed by Article 118 (2) and (3) could be included offenses to those defined in the other two subsections. Accordingly, the intent to kill or the intent to inflict great bodily harm involves a different state of mind than an intent to kill premeditatively. Manual for Courts-Martial, United States, 1951, paragraph 197, in discussing murder makes the following explanation: "Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended." It is not so precise in connection with the intent to kill or inflict great bodily harm prohibited by Article 118 (3). In dealing with that particular intent it states: "Hence, if a person does an intentional act likely to result in death or great bodily injury, he may be presumed to have intended death or great bodily harm." If we interpret correctly, the Manual seems to point clearly to the concept that premeditated murder only requires a specific intent to kill and that the other intents may be inferred from the nature and probable consequences of the act if purposely done. This amounts to a general criminal intent.

This interpretation seems to be consistent with the other provisions of Article 118. It may be that under any interpretation, difficulties will be encountered in applying the rule but the construction we adopt seems likely to cause less confusion. At best there could be no more than three instances of specific intent mentioned in the Article. Those are included under subsections (1) and (2). The offenses included under subsection (3) and some of the felonies listed under (4) do not require specific intent and if we were not to interpret the Article in the manner set forth above, we would find that intoxication might reduce murder, both premeditated and unpremeditated as defined in subsections (1) and (2) and parts of (4), to manslaughter, while as to the crime proscribed in subsection (3) and parts of (4), it would be non-effective. If, for illustrative purposes, we assume that an accused is charged under a specification alleging premeditated murder and the facts permit a finding of a premeditated design

to kill, and also permit a finding that the killing occurred as a result of an act which was inherently dangerous to others, the law officer might be faced with this unusual situation if intoxication was in issue. He would be required to instruct the court that it could be considered in determining whether the accused could form a specific intent; and if he could not, the crime could be reduced from premeditated murder to manslaughter unless there was also involved the lesser offense of unpremeditated murder arising out of doing an act inherently dangerous to others and in that event it could not be reduced below unpremeditated murder. We may not see clearly all the implications, but to have the offenses leap-frogging each other would make applying of the act and instructing the court a confusing and uncertain business. On the other hand, to permit intoxication to be considered only for the purpose of reducing premeditated murder to ordinary murder would make less complicated the difficult problems encountered.

It is axiomatic that an accused should not be prejudiced merely to improve a procedure but the wording of the act and the state of the Federal law lead us to conclude that the intent to kill or the intent to inflict grievous bodily harm as they are defined in Article 118 (2) with a lesser penalty are states of mind contemplated by Congress to include only a general intent. If so, the defense of intoxication is inapplicable. Voluntary drunkenness has never been considered as an excuse for committing a crime. All authorities agree that it is easily simulated and that heinous offenses should not go unpunished merely because of self-imposed intoxication. If a person kills intentionally or while perpetrating an intentional act likely to result in death or great bodily harm, he may be convicted of one of the most serious offenses found on the statute books. The excuse of voluntary intoxication should not be perverted into a means of reducing that offense to a misdemeanor. It is necessary to punish those who commit certain offenses while under the influence of intoxicating liquors, and we believe that unpremeditated murder falls in that category.

**659**

In accordance with our powers under Article 59b, 50 USC § 646, we affirm a finding of guilty of the lesser included offenses of unpremeditated murder under Charge I, and assault with a dangerous weapon under Charge II. In addition, the assault with a dangerous weapon under Charge III is affirmed.

Because of the reduction in two of the principal offenses, we return the record to The Judge Advocate General of the Army for reference to a board of review for reconsideration of the sentence in the light of our holding.

Chief Judge QUINN and Judge BROSMAN concur.