**UNITED STATES, Appellee,**

**v.**

**Private E1 Darryl Q. MORGAN, 333–74–5071, United States Army, Appellant.**

**ACMR 8901706.**

U.S. Army Court of Military Review.

10 Dec. 1991.

For Appellant: Jonathan P. Tomes, Esquire (argued), Earl L. Washington, Captain James K. Lovejoy, JAGC, Captain Michael P. Moran, JAGC (on brief).

For Appellee: Captain Randy V. Cargill, JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC (on brief).

Before JOHNSON, WERNER and GRAVELLE, Appellate Military Judges.

OPINION OF THE COURT

WERNER, Judge:

In this appeal from his conviction of the unpremeditated murder of another soldier, the appellant asserts, *inter alia*, that the military judge erroneously failed to instruct the court on the partial defense of voluntary intoxication and improperly instructed it on the question of adequacy of provocation.[1] He prays that we set aside

1. In addition to unpremeditated murder, the general court-martial composed of officer and enlisted members convicted the appellant of assault and battery, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 928 (1982) [hereinafter

the findings and sentence. We disagree with his assertions and deny his request for relief.

## I.

At about 2030 hours on the evening of 6–7 January 1989, the appellant and some friends got together at the apartment of the appellant's German girlfriend where they began drinking various alcoholic beverages. At about 2100 hours, they went to a local discotheque (Charly's Club) where the appellant's girlfriend worked as a barmaid. There, the appellant continued to drink alcoholic beverages. At about 2330 hours, Private First Class Seitz and some friends arrived at Charly's Club after having spent several hours drinking at a bar called Mainzer's.

At about midnight, the appellant, who is black, and Seitz, who was white, became involved in an altercation on the dance floor. The circumstances, as described by one of the government's witnesses, Specialist Samuels, are set forth below:

I was on the dance floor with my dance partner and off to my right there was another girl on the dance floor. She was dancing alone.... Seitz was standing up, and he was facing the dance floor, and Darryl [the appellant] was off to the side ... and he was facing the dance floor.

....

[A]nd Darryl went out on the dance floor and starting dancing with the girl, and then Seitz came from the table and stepped in between both of them, facing Darryl, and walked him off the dance floor. He didn't raise his hands or touch him or anything like that. He just got in between them and they were face to face ... and he walked Darryl back to the edge of the dance floor. After that he went back to the table and stood up again. The girl was still dancing alone and she was still facing Seitz and Darryl. Then Darryl went out there again and started dancing with her, and then Seitz

came out again and stepped in between them, facing Darryl, and walked him off the floor again. At that time Seitz came out and started dancing with the girl.

....

Then, after Darryl was walked off the floor the second time, I was looking at Darryl, and Darryl looked at me as if he was saying, "Can you believe this guy?" ... And then Darryl came from the end of the dance floor and punched Seitz in the mouth, and that one punch sent Seitz to the dance floor, and Darryl was on top of him. People have said since then that [Darryl] was punching him, but I couldn't tell because I was standing behind him. I don't know if it was a choke hold or not. I know he had him down on the floor.

After the two were separated, the appellant and Seitz departed the discotheque accompanied by their respective companions. In the adjacent parking lot, one of Seitz' friends, Private Livingston, approached the appellant and admonished him for assaulting Seitz. Livingston admitted he may have cursed and directed racial slurs at the appellant and his German girlfriend who was attempting to calm the still-agitated appellant. Other witnesses attested to the fact that Livingston had indeed conveyed racial slurs to the appellant and his girlfriend. As the appellant walked away from Livingston, the latter followed, continuing to berate him and, at one point, pushing his girlfriend. There was some evidence that Livingston may have threatened the appellant. Seitz remained behind, a short distance from the appellant, talking with one of the appellant's friends, Specialist Lewis.

According to Lewis, Seitz appeared dazed, unaggressive and remorseful. Lewis stated that during the altercation, Seitz made no effort to defend himself from the appellant's blows and appeared to be intoxicated. He talked to Seitz for about ten minutes in the parking lot during which Seitz said, "I don't know why I came down

UCMJ]. He also pled guilty to an unauthorized absence of eight days, in violation of Article 86, UCMJ, 10 U.S.C. § 886. His approved sentence

included a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to Private E1.

here. I didn't want to start no fight or nothing. All I wanted to do is just get drunk." Suddenly, the appellant picked up a broken champagne bottle, brushed past Lewis, and stabbed Seitz in the neck with the broken bottle causing blood to spurt over Lewis. Lewis testified that Seitz did not see the appellant coming as he was looking away from the appellant and had his head down. The blow was sufficiently powerful to sever Seitz' carotid artery, chip a piece of bone out of his spine, and ultimately cause him to bleed to death. Livingston testified that he heard the appellant break the bottle prior to stabbing Seitz; appellant's girlfriend testified that the bottle was already broken when the appellant picked it up. The appellant immediately fled the parking lot and went to his girlfriend's apartment. As he was running away, he dropped his hat and stopped to pick it up.[2]

Shortly thereafter, Specialist Lewis arrived at the girlfriend's apartment. There, the appellant admitted that he "punched" Seitz. After Lewis informed him that Seitz was dead, the appellant asked him to drive him to another friend's house where he intended to go into hiding. He then directed Lewis to the house. As they entered the house, Lewis observed, "He [the appellant] was very scared. He was breathing very heavily. His chest was rising. His eyes were big and he was just very, very scared. He was saying, 'I fucked up, man. I might need to stay here for awhile. I fucked up.'" At 0400 hours on 7 January 1989, the appellant was apprehended by the German police. Blood samples drawn from him at 0505 and 0535 hours contained "medium values" of 1.42 and 1.29 milliliters of alcohol, respectively.

2. The government's evidence was, in large part, contravened by the testimony of two defense witnesses—appellant's girlfriend and her girlfriend. Their version of the events in the parking lot painted a picture of Seitz acting in conjunction with Livingston in behaving in an aggressive, threatening manner. For example, they indicated that Seitz followed the appellant and his girlfriend, continued to verbally berate or argue with them, and that he had his fist balled up in a menacing posture when the appellant struck him with the bottle. The judge properly instructed the court on these matters

II.

The principal issue raised by the appellant in this appeal concerns the absence of instructions by the military judge on the effect of voluntary intoxication on the appellant's ability to entertain the specific intent to kill.[3] Essentially, he contends that the military judge should have, *sua sponte*, instructed the court that it could not find the appellant guilty of unpremeditated murder if the evidence of voluntary intoxication raised a reasonable doubt that he lacked specific intent to kill Seitz. Appellant premises his contention on the Court of Military Appeals' opinion in *United States v. Tilley*, 25 M.J. 20 (C.M.A.1987), *cert. denied*, 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988).

In determining that the military judge did not err by failing to give a defense-requested instruction regarding the impact of the accused's voluntary intoxication and mental condition on his specific intent to kill, the *Tilley* court opined:

Another question which is raised in this unpremeditated-murder case is whether evidence of voluntary intoxication should ever be considered on the question of one's capacity to form the intent to kill or inflict great bodily harm. *See* 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 4.10(a) (1986); *cf.* 2 *Substantive Criminal Law* § 7.11(d). The Government, relying on older decisions of this Court, asserts that voluntary intoxication, as a matter of law, cannot reduce unpremeditated murder to manslaughter. *See United States v. Ferguson*, 17 U.S.C.M.A. 441, 38 C.M.R. 239 (1968); *United States v. Craig*, 2 U.S.C.M.A. 650, 10 C.M.R. 148 (1953);

and the court chose not to believe the version presented by the defense witnesses. We perceive no reason to disturb the court's determination.

3. Although the appellant did not raise this issue in the court below, we decline to invoke waiver. *See United States v. Taylor*, 26 M.J. 127 (C.M.A.1988); Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 920(e)(3) and 916(*l*)(2) [hereinafter R.C.M.].

**1058**

*United States v. Roman,* 1 U.S.C.M.A. 244, 2 C.M.R. 150 (1952). *See also,* para. 197, Manual, *supra.* Accordingly, it concludes that evidence of voluntary intoxication is legally irrelevant in all cases of unpremeditated murder. Mil.R.Evid. 402, Manual, *supra.* The defense, relying on *United States v. Thomson,* [3 M.J. 271 (C.M.A.1977)], and *United States v. Vaughn,* 23 U.S.C.M.A. 343, 49 C.M.R. 747 (1975), suggests that the older decisions are no longer good law or are inapplicable to cases where evidence of voluntary intoxication does not stand alone.

We note that the *Vaughn* decision clearly holds that the intent to kill or commit great bodily harm required by Article 118(2) is a specific intent and, accordingly, the primary rationale of *Ferguson, Craig,* and *Roman* has been eroded. On the other hand, that decision cites *Ferguson* without expressly repudiating its holding. *United States v. Vaughn,* 23 U.S.C.M.A. at 345, 49 C.M.R. at 749. Moreover, a related rationale expressed in *United States v. Roman,* 1 U.S.C.M.A. at 251, 2 C.M.R. at 157, and *United States v. Ferguson,* 17 U.S.C.M.A. at 443, 38 C.M.R. at 241, that the intent to drink may suffice for malice aforethought or other intent necessary for unpremeditated murder has not yet been rejected. *See United States v. Hernandez,* 20 U.S.C.M.A. 219, 223, 43 C.M.R. 59, 63 (1970). The prudent action of the judge in giving his instructions in the present case makes it unnecessary to resolve this question today. *See* Part IV, para. 43c(2)(c) and (c)(3)(c), Manual for Courts–Martial, United States, 1984.

*Id.* at 22.

Unlike the court in *Tilley,* we are squarely faced with the question alluded to in its opinion as the military judge failed to pro-

vide any instructions on the effect voluntary intoxication may have had on the appellant's intent to kill Seitz. Rule for Courts–Martial, 920(e)(3) requires military judges to render a "description of any special defense under R.C.M. 916 in issue[.]" "A matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose." R.C.M. 920 discussion.

Rule for Courts–Martial 916(*l*)(2) provides:

> Voluntary intoxication, whether caused by alcohol or drugs, is not a defense. However, evidence of any degree of voluntary intoxication may be introduced for the purpose of raising a reasonable doubt as to the existence of actual knowledge, specific intent, willfulness, or a premeditated design to kill, if actual knowledge, specific intent, willfulness, or premeditated design to kill is an element of the offense.

However, the discussion to the Rule states, "[v]oluntary intoxication ... will not reduce murder to manslaughter or any other lesser offense[;]" and the Manual's [4] analysis of the discussion cites *United States v. Ferguson,* as authority for the exception to the Rule. Clearly, the Manual reflects the precise anomaly described by the Court of Military Appeals in the passage quoted above from its *Tilley* opinion. Namely, although the President has promulgated a general requirement that, where warranted by the evidence, instructions must be administered on the effect, if any, voluntary intoxication may have had on an accused's specific intent to kill or inflict grievous bodily harm, case law has established an exception to that instructional requirement where the offense involved is unpremeditated murder.[5] Although resolu-

---

4. Manual for Courts–Martial, United States, 1984 [hereinafter MCM or the Manual].

5. In his erudite and compelling article, *Voluntary Intoxication as a Criminal Defense Under Military Law,* 127 Mil.L.Rev. 131 (1990), Major Eugene R. Milhizer has criticized the exception to the general rule as being "illogical, inconsistent and based upon a faulty premise." *See also*

Milhizer, *Murder Without Intent,* 133 Mil.L.Rev. 205, 239 (1991). According to Milhizer, the Court of Military Appeals rejected voluntary intoxication as a partial defense to unpremeditated murder in *United States v. Roman,* in reliance upon various decisions from civilian courts which held the defense untenable when *mens rea* was measured by the criterion of "malice aforethought" which he defines as "a predet-

tion of the question at bar mandates that we venture into the swirling waters between the Scylla of *United States v. Roman* and the Charybdis of *United States v. Vaughn*, our journey is not completely uncharted.

In the first place, the holding of *Vaughn* is factually distinguishable from this case as the *sole* basis for Morgan's claim he lacked the requisite specific intent is that he was voluntarily intoxicated. In *Vaughn*, the accused contended he did not have the capacity to entertain the intent to kill or inflict grievous bodily harm because he lacked mental responsibility. This distinction was recognized in the court's opinion by Senior Judge Ferguson who observed:

> Moreover, intoxication is a voluntary act on the part of an accused and it would be strange indeed to permit him to escape the consequences of his deadly and malicious act because he had himself created the situation by which it is argued that he lost the capacity to intend.
>
> On the other hand, mental disorders are involuntary. Rather than being the result of the accused's actions, they are usually the causative factor. Their origin and treatment is not wholly understood by the medical profession. Vast differences of opinion exist among psychiatrists even as to their existence. Those who suffer from them are the objects of our pity and concern. It would ill-behoove us, therefore, to say on

the one hand that the accused is guilty of unpremeditated murder only if he possesses a particular intent and, at the same time, to deny him the opportunity to have the factfinders consider that, for reasons quite beyond his control, he was mentally incapable of forming that intent. We conclude that the doctrine of partial mental responsibility applies to the crime of unpremeditated murder and that, as found by the Court of Military Review, the military judge's instruction to the contrary was prejudicially erroneous.

*Vaughn,* 49 C.M.R. at 749–50.[6]

Indeed, Judge Ferguson's concurring opinion in *United States v. Ferguson,* reveals that even he believed that although voluntary intoxication could be a defense to an offense involving specific intent, the offense of "unpremeditated murder, though it involves the specific intent to kill or inflict grievous bodily harm, stands by itself in this area, and voluntary intoxication not amounting to legal insanity is not a defense thereto." 38 C.M.R. at 241 (citations omitted).

Secondly, there is some evidence that Congress may not have intended that voluntary intoxication should be a defense to unpremeditated murder. In his majority opinion in *Ferguson,* Chief Judge Quinn refers to *Roman* and its progeny as holding that under established military and common law, unpremeditated murder was a

---

ermination to do an illegal act." However, as the *mens rea* element of the military offense of unpremeditated murder has not been "malice aforethought," having been legislatively supplanted by the element of "specific intent to kill or inflict grievous bodily harm," its use as a rationale in the court's foundational precedent [*Roman* ] would appear "arguably misplaced." 127 Mil.L.Rev. at 164. Milhizer also suggests that the *Roman* exception is inconsistent with subsequent decisions from the Court of Military Appeals holding voluntary intoxication to be a partial defense to specific intent offenses. *See e.g. Ellis v. Jacob,* 26 M.J. 90 (C.M.A.1988); *United States v. Sasser,* 29 C.M.R. 314 (C.M.A.1960). A corollary assertion, is that the *Roman* exception is antithetical to Congressional intent in promulgating Article 118(2) of the UCMJ. 127 Mil.L.Rev. at 165.

Conversely, Milhizer has noted:

Arguments to the contrary—that voluntary intoxication should not operate as a partial defense to unpremeditated murder—have been often made and likewise have merit. Perhaps most important among these contentions is that society is justifiably unwilling to permit an accused who unlawfully takes the life of another to have his potential maximum punishment to confinement drastically reduced because he first became voluntarily intoxicated. As one commentator observed in this regard, an intoxicated accused who commits a homicide may be even "morally worse" than his sober counterpart who commits a similar crime.

127 Mil.L.Rev. at 166 (footnotes omitted).

6. In *Tilley,* the court acknowledged that *Vaughn* did not repudiate the holdings of *Roman* and its progeny (*United States v. Ferguson* and *United States v. Craig* ). 25 M.J. at 22.

general intent crime; and that Congress intended to retain the established rule that voluntary intoxication would not reduce unpremeditated murder to some lesser offense. However, he also observes that "even the more moderate modern law will not allow the state of [the accused's] voluntary intoxication by itself to reduce the degree of the crime from murder to a lesser degree of homicide." 38 C.M.R. at 241. The legislative hearings on this point reflect that some members of Congress questioned whether unpremeditated murder should be made a specific intent crime and whether malice aforethought should be eliminated as an element thereof. Our reading of their comments indicates that they would not have reduced unpremeditated murder to voluntary manslaughter unless the killing occurred in the heat of passion. *See also* H.R.Rep. 2498, 81st. Cong., 1st Sess. 1 (1949), *reprinted in* 1 Index and Legislative History to the Uniform Code of Military Justice, 1950 at 1231 and 1246–52 (1985).

Furthermore, Congress may have been at least tacitly aware of the holding in *Roman* after its publication in 1952. Although, Congress did not revise Article 118 in either the 1968 or 1983 amendments to the UCMJ, the *Roman* exception was added to Manual for Courts–Martial, United States, 1969, (Rev. ed.), para. 154(*a*)(3) and 197*a*, and is currently embodied in the 1984 Manual in R.C.M. 916(*l*) and Part IV, para. 43c(3)(c). Regulations which accompany legislation are a guide to legislative intent. *United States v. Clardy*, 13 M.J. 308, 315 (C.M.A.1982); *see also United States v. Desha*, 23 M.J. 66 (C.M.A.1986) (citing *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (authoritative administrative constructions should be given the deference to which they are entitled.)). It would therefore appear that whatever the original intent of Congress may have been, the construction of that intent by the Court of Military Appeals some thirty-nine years ago and the consistent interpretation by the President since then reflect the view that voluntary intoxication should not be a partial defense to unpremeditated murder.

We perceive sound policy reasons for retaining the *Roman* exception. In the Army Court of Military Review's most recent decision on this issue, *United States v. Trower*, 2 M.J. 492 (A.C.M.R.1976), a case involving unpremeditated murder, this court held that a military judge correctly denied a defense-requested instruction on diminished capacity due to voluntary intoxication. Judge Mounts, relying on *United States v. Ferguson*, articulated what this court conceived to be the underlying policy rationale for the exception:

The denial of the defense of voluntary intoxication in an unpremeditated murder offense is not a fiction. It is a pragmatic recognition in the law of the need for stronger safeguards to the general safety of the community for the crime of murder when compared with crimes of lesser impact on the community safety such as larceny. The sanctity of human life and its continued preservation by the state from violent fatal harm is the keystone of any enlightened society's criminal law system. In recognition of this basic element of the social contract, legislators continually grade crimes not only to determine the proper degree of punishment but also to decide the statutory elements required to make a given set of acts a crime. In making these decisions, it is necessary to consider the societal need for adequate protection against crimes involving homicide as one of the most basic and important needs. This need is balanced against the jurisprudence of excusing a person from the consequences of certain acts due to voluntary intoxication. The law has still not reached total agreement as to the legal effects of intoxication. In *Powell v. Texas*, [392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968)] the United States Supreme Court acknowledged the difficulty of finding medical certainty in dealing with alcoholism and its effects. Under such circumstances, it should not be surprising to find legislators and courts reticent to excuse unpremeditated murder due to voluntary intoxication. Most legislators apparently feel that there is

sufficient evidence as to the effects of alcohol to permit voluntary ingestion to be a defense to a crime against property such as larceny. A doubt as to the effects of alcohol in this area of lesser offenses or offenses against property, when resolved in favor of the accused, does not cut to the most basic need for societal protection and can be tolerated by the society without serious challenge to the underlying basic need of the social contract. Doubt as to the effects of alcoholism can not, however, be resolved in favor of the accused for the offense of unpremeditated murder. This offense goes to the very basic need for protection in our society. Here the doubt is resolved in favor of an attempt to control the drinker and we, therefore, condemn the consequences of the act, regardless of a state of voluntary intoxication. Since the intoxication is in fact voluntary, society expects or at least hopes that the accused will not place himself in the condition where he may commit unpremeditated murder, but if he does, he does so at his own risk. Thus society, perhaps not effectively, but nevertheless in a very pragmatic manner warns the alcoholic drinkers that only some but not all of their acts, may be excused due to voluntary intoxication and subsequent loss of the ability to form a specific intent. Such a result is salutary and in keeping with the precepts of an enlightened society's concern with due process.

It is not, however, a fiction; it is the reasoned recognition under law of the predominate need for the safety of our society when judging the "free will" legal aspects of intent to kill in the offense of premeditated murder.

2 M.J. at 493–94 (footnotes omitted).

This rationale continues to retain its viability in the context of contemporary needs and goals of the Army. Since *Trower*, the Army has developed and promulgated a comprehensive policy designed to deter drug and alcohol abuse by servicemembers. *See generally* Army Reg. 600–85, Personnel–General: Alcohol and Drug Abuse Prevention and Control Program, (21 Oct. 1988). Although the primary purpose of this policy is to enhance the health and readiness of members of the Army, it also has implications for military discipline. *See United States v. Middleton*, 10 M.J. 123 (C.M.A.1981); *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980). We would be doing a disservice to the efficacy of the policy against substance abuse were we to disturb the long-standing rules of law and procedure proscribing voluntary intoxication as a partial defense to unpremeditated murder. Accordingly, we are satisfied that one who intentionally kills another while under the influence of his own voluntary action in becoming intoxicated is not entitled to an instruction that would vitiate or excuse his conduct on grounds he lacked specific intent. Hence, the absence of such an instruction is not error.[7]

7. Of course, in the event that military law were to require instructions on the effect of voluntary intoxication on the appellant's intent to kill or inflict grievous bodily harm, we would be constrained to hold that the absence of such instructions on the facts of this case would constitute prejudicial error. *United States v. Oisten*, 33 C.M.R. 188 (C.M.A.1963); *Sasser*, 29 C.M.R. 314.

There was ample evidence of record that the appellant drank a substantial quantity of alcoholic beverages during the hours preceding the attack on Seitz. The evidence that the alcohol level in his blood remained elevated some four hours after the incident corroborated the testimony of several witnesses that he had been drinking *throughout the evening*. This would have been sufficient to raise the issue of whether his capacity to entertain the requisite specific intent was impaired. There was also countervailing evidence reflecting that appellant's men-

tal faculties were functioning with ample clarity, quickness, and consciousness of guilt. This evidence includes his attacking an individual who was unprepared to defend himself; his halting his flight from the scene of the offense to pick up his hat; his giving of accurate directions to Specialist Lewis as he drove the appellant, during darkness, to a potential hideout; and his commenting, upon his arrival, that he knew what he had done and needed a place to hide. However, although these matters might have led the court to conclude the appellant had the capacity to entertain the specific intent to kill Seitz, they would not have vitiated the need for proper instructions to enable the court to make that determination for itself.

A considerable body of military law pertaining to the duty to instruct on voluntary intoxication in unpremeditated murder cases would, *a fortiori*, also become obsolete. In one of its earliest opinions, the Court of Military Appeals

## III.

■ The appellant also challenges the sufficiency of the military judge's instructions on the lesser-included offense of voluntary manslaughter. Specifically, he asserts that the judge erred by failing to instruct the court, as requested by his trial defense counsel, to consider Livingston's actions as well as those of Seitz in determining whether there was adequate provocation for the appellant to have killed Seitz.[8]

The judge instructed, in relevant part, that:

> Insulting or abusive words or gestures, a slight blow with the hand or fist, and trespass or other injury to property are not, standing alone, adequate provocation.
>
> The provocation must originate with the victim. Therefore, the obscenities and acts of Livingston may not be considered as provocation.
>
> However, you may consider Livingston's actions and words insofar as they may have interfered with the accused's ability to have time to reflect and cool himself so that he was not acting under the influence of sudden passion.

At trial, the government opposed the defense's instructional request in reliance on a principle espoused in *United States v. Garza*, 37 C.M.R. 814 (A.F.B.R.), *pet. denied*, 37 C.M.R. 471 (C.M.A.1966), that is,

"there must be some evidence the provocation was generated by the person unlawfully killed." *Id.* at 828. On appeal, the government also bases its opposition on the established principle that mere words and insults are insufficient to establish adequate provocation. *United States v. Maxie*, 25 C.M.R. 418 (C.M.A.1958); *United States v. Edwards*, 15 C.M.R. 299 (C.M.A.1954); MCM, Part IV, para. 44c(1)(b). Hence, the government argues, even if the judge erred in failing to instruct the court to consider Livingston's actions on the issue, it was harmless. We find the government's position persuasive.

Military law recognizes voluntary manslaughter as an unlawful killing of another in the "heat of sudden passion caused by adequate provocation" resulting from "fear or rage." A "person may be provoked to such an extent that in the heat of sudden passion caused by the provocation, although not in necessary defense of life or to prevent bodily harm, a fatal blow may be struck before self-control has returned." MCM, Part IV, para. 44c(1)(a). For the provocation to be adequate, it must "excite uncontrollable passion in a reasonable person, and the act of killing must be committed under and because of the passion." The provocation must not be "sought or induced." Nor will it be deemed adequate if, measured by objective reasonableness, "sufficient cooling time elapses between

---

held that *some* evidence of intoxication is not, of itself, sufficient to raise the defense to the point of requiring instructions as to the effect on specific intent.

> [T]he rule is that if there is evidence in the record from which a reasonable man could conclude that the degree of intoxication was such that it would impair the capacity of the accused to form a specific intent, then the instruction must be given. No other hard and fast rule can be prescribed, as such a man may be grossly intoxicated and yet be able to form a premeditated design to kill, while in others, the capacity to form an intent to kill may be blurred by the presence of a lesser degree of intoxication.

*United States v. Craig,* 10 C.M.R. at 154 (citing *United States v. Backley,* 9 C.M.R. 126 (C.M.A.1953)) ("the showing we contemplate as requiring instruction must certainly be one of *intoxication,*—and, moreover, intoxication of a *certain degree and sort,* characterized by a dis-

cernible relationship to the potential absence of a capacity to entertain specific intent."); *accord United States v. Sampson,* 7 M.J. 513 (A.C.M.R.1979).

The evidentiary burden on the defense to "reasonably raise" the issue of voluntary intoxication would be much lower under the standard set forth in R.C.M. 920(e). It is not necessary that the evidence tending to establish a defense be compelling beyond a reasonable doubt to trigger the instructional duty. Instead, only some evidence to which the fact finders might attach credit is sufficient. *United States v. Sellers,* 33 M.J. 364 (C.M.A.1991); *United States v. Taylor,* 26 M.J. 127 (C.M.A.1988).

**8.** After the judge refused to give the requested instruction, the defense counsel requested and obtained an instruction that the court consider whether Livingston's actions affected his ability to cool down after fighting with Seitz in the discotheque.

the provocation and the killing … even if the accused's passion persists." MCM, Part IV, para. 44c(1)(b).

The sufficiency of the instructions depends on the evidence of record. As we view it, there were four possible provocation factors: 1) the altercation with Seitz in Charly's Club with its racial implications; 2) Livingston's racial insults to the appellant and his girlfriend in the parking lot; 3) Livingston's pushing of appellant's girlfriend; and 4) Livingston's alleged threat to the appellant. All of these factors were described by the military judge in his summarization of the evidence to the court. However, the judge admonished the court that they could not consider the latter three in determining whether appellant's rage was justifiably ignited, but only as to whether it affected appellant's ability to "reflect and cool himself."

We hold that the military judge's instructions were correct under the circumstances. We are persuaded that the rule set forth in *United States v. Garza*, is sound and was properly applied in this case. We can envision a scenario in which an accused might reasonably have perceived that Seitz and Livingston were acting in concert against him as warranting an instruction on provocation because of Livingston's actions. However, we do not find that situation present in this case. Accordingly, the appellant's assigned error is without merit.

We have considered the remaining assignments of error and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge JOHNSON and Judge GRAVELLE concur.